## UNITED STATES v. LAWINSKI.

### No. 10528.

United States Court of Appeals
Seventh Circuit.

March 5, 1952.

Rehearing Denied April 18, 1952.

Simon Herr, Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty. Daniel P. Ward, Asst. U. S. Atty, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendant was charged in an indictment in seven counts with the unlawful transportation in interstate commerce of seven stolen Chevrolet automobiles, knowing the same to have been stolen, in violation of Section 2312, Title 18 U.S.C. In view of a variance between the averments and the proof, Count 4 was not submitted to the jury. Upon Counts 1, 2, 3, 5, 6 and 7 the jury returned a verdict of guilty. Defendant was sentenced to five years in the custody of the Attorney General, on each of Counts 1, 2 and 3, the sentences on Counts 2 and 3 to run concurrently with the sentence imposed on Count 1; five years on Count 5, to run consecutively to the sentences imposed on Counts 1, 2 and 3; five years on Counts 6 and 7 to run concurrently with the sentence imposed on Count 5. On appeal defendant assigns as error undue limitation of his cross-examination of the government witnesses, George Coulter, Virgil Wall, Henry Dybowski and Helen Ibsen.

Though the question presented on appeal is simply stated, its determination has involved a consideration of the factual issues at the trial and necessitated an examination of the evidence. The record reflects a sordid story of the adventures of three men in a concerted criminal undertaking. Henry Dybowski, also known as Jerome Stayer, a former bartender, Virgil Wall, a mechanic, and the defendant, Edwin Lawinski, a former racing driver, after some discussion, agreed that Lawinski would steal Chevrolet automobiles in Illinois; that Wall would change the motor numbers on the cars and that Dybowski and Lawinski would procure, through forged papers, Wisconsin licenses, and then dispose of the stolen vehicles. The proceeds of sale were to be shared by the three. That thieves do fall out is demonstrated by the fact that though Wall changed the numbers on the car first stolen and instructed defendant how to do so and received his part of the proceeds of sale of that car, his partners in crime apparently did not seek his aid as to any other of the six cars involved but handled the remainder of the operation themselves. Again illustrative of the truth, Dybowski, though he cooperated with defendant in the theft, transportation and disposition of the six cars mentioned in the indictment, apparently found it possible to dispense with Lawinski's help in disposing of fourteen other cars, with the theft of which defendant was not charged, at least in this case. In short, the evidence submitted by the government tended to prove and justified the jury in finding that defendant, in association with Dybowski, alias Stayer, stole the six automobiles, changed or caused the motor numbers thereon to be changed, by misrepresentation procured Wisconsin licenses therefor and then drove them, between the dates of November 23, 1949 and June 28, 1950 to Coon Rapids, Iowa, and there sold and delivered them to George Coulter, a dealer in automobiles and implements.

Coulter testified for the government that between November 23, 1949 and ending with June 28, 1950, at his place of business in Iowa, he bought the six vehicles from defendants, Lawinski and Dybowski, receiving with each car a bill of sale and giving to the two men his check for the purchase price. The evidence of titles received purported in each instance to represent valid Wisconsin titles. He said that he later reimbursed the persons to whom he sold the cars. This, in substance, was his entire testimony. He was questioned only as to transactions mentioned in the indictment and as to the automobiles delivered to him within the period covered by the indictment, that is, between November 23, 1949 and June 28, 1950. Though on cross-examination the court extended to his counsel liberal latitude, objections to certain interrogations were sustained.[1]

---

I. The specific questions asked Coulter to which objections were sustained were as follows:

"Q. Between June 28, 1950 and this date in November you have just mentioned, how many times did you see Jerome Stayer?

\*　　\*　　\*　　\*　　\*　　\*

"Mr. Ward: Objection. That is not cross-examination.

On cross-examination the witness was permitted to testify that he never saw either Dybowski or defendant until they approached him, together, in November, 1949, when they told him that Virgil Wall had sent them to him. He was exhaustively cross-examined as to these statements without restriction. In addition, he was permitted to testify that he got other cars from Dybowski, twenty in all, and last saw him in November 1950. Though his direct testimony covered only eight typewritten pages, his cross-examination covered twelve.

Defendant complains of the rulings in four respects. It is apparent that the question as to how many times between June 28, 1950, the last date charged in the indictment, and November, 1950, Coulter had seen Dybowski alias Stayer, was clearly beyond the scope of anything brought out in direct examination. It was wholly immaterial and irrelevant to the issues before the jury how many times Coulter saw Dybowski after the period covered by the indictment. Defendant offered no explanation as to the relevancy of the question except to intimate that it was asked in order to test the memory of the witness. The other inquiries related to the same subject matter, namely: who accompanied Dybowski on other trips to sell Coulter on occasions when Lawinski was not present. In other words, though the direct examination was confined to Coulter's purchases from defendant and Dybowski, defendant sought to bring out on cross-examination, information as to what third parties did on other occasions, not related in anywise to the charges of the indictment and wholly beyond the scope of questions asked on direct examination.

The witness Virgil Wall testified that in November, 1949, he taught defendant how to change motor numbers, that he himself changed the numbers on the car mentioned in Count 1 and that he participated in the money received from Coulter for that car. The government confined its direct examination to the transactions of Wall with the defendant. The questions on cross-examination, to which objections were sustained[2] did not relate to those transactions but were in essence inquiries

---

"The Court: Sustained.

\*　\*　\*　\*　\*　\*

"Q. How many times, other than these, (the cars mentioned in the indictment) did Jerome Stayer bring more than one car to your place of business? (Not answered.)

"Q. Can you state who accompanied him on these occasions?

"Mr. Ward: Objection as going beyond the scope of the examination.

"The Court: Sustained.

\*　\*　\*　\*　\*　\*

"Q. Did Jerome Stayer come to your place of business with anyone other than Edwin Lawinski?

"Mr. Ward: Objection, your Honor, it exceeds the scope of the direct examination.

"The Court: Limit it to any of these dates he was talking about, (those in the indictment).

"Mr. Herr: Other days.

"The Court: No, sustained.

"Q. How many times in all was Jerome Stayer at your place of business?

"Mr. Ward: Objection again, as being covered.

"The Court: It is already answered."

---

2. The specific questions to the witness Virgil Wall objections to which were sustained were as follows:

"Q. Had you at that time (that is, in 1948) engaged in the theft of cars? Objection sustained.

"Mr. Herr: He is an accomplice . \* \* \*.

"The Court: You may bring out any participation in the steps described in this indictment and any previous convictions of felonies.

\*　\*　\*　\*　\*　\*

"Q. When did you first make the statement?

"Mr. Ward: We will submit that is objectionable. I can't see its relevancy. It is clearly outside of the scope of the direct examination.

"The Court: Unless there is some reason for it, I do not see that it has any materiality.

"Mr. Herr: I think it has.

"The Court: What is it you want to bring out?

"Mr. Herr: When he made the statement he made known his complicity and if he be guilty of part of this affair that he has no indictment against him by reason of it.

as to whether in 1948, long prior to the first date in the indictment, the witness was engaged in the theft of automobiles. This was clearly beyond the scope of the examination in chief. The trial court appreciated the fact that perhaps defendant was attempting to impeach the credibility of the witnesses and advised counsel that he might bring out, by means of cross-examination, evidence of participation by the witness in the charges against Lawinski as a matter of impeachment and that he might also, if he could, introduce evidence of previous convictions of the witness. The court remarked that it desired to allow counsel a wide latitude but that it did not want to get into collateral transactions not related to the indictment. The witness had testified that he had been convicted of the crime of transporting stolen automobiles. The court sustained objections to questions as to whether the witness had changed motor numbers on automobiles not involved in the indictment and as to how many stolen cars he had handled. What he had done with regard to cars not involved in this indictment was wholly irrelevant. If the questions were intended for impeachment purposes, proper methods of showing additional convictions of offenses, as advised by the court, might have been employed, if defendant was not satisfied with Wall's admission of convictions. Finally defendant complains that he was deprived of an opportunity to discover why Wall had not been indicted in this case, a question wholly irrelevant to the question of guilt or innocence of the defendant. True Wall was an accomplice but a liberal latitude was permitted in his cross-examination and why he had not been indicted in this specific case was a question not affecting defendant's guilt or innocence. Indeed the record discloses no evidence that Wall participated in the unlawful transportation. Inasmuch as Wall admitted he had been found guilty of other similar offenses, we think the limitation upon the cross-examination was sufficiently liberal as to protect fully defendant's rights.

Defendant's co-actor in crime, Dybowski, upon direct examination, testified that defendant agreed to steal cars and that he, Dybowski, "would get the titles in Wisconsin"; that defendant introduced him to Wall; that the three cooperated as to the car mentioned in Count 1. Lawinski was to steal the car, Wall to change the numbers and Dybowski to get the licenses. He said that defendant took him to Madison where he applied for and got licenses for the various cars mentioned in the indictment under assumed names; that defendant and he took the stolen cars to Coon Rapids; that defendant introduced him to Coulter as Stayer, a car dealer. He told the story of each car mentioned in the indictment. He said that after the first change of numbers, Wall changed no more but that defendant did and that thereafter the two split

"The Court: He has an indictment against him on the subsequent phases.

"Mr. Herr: Not on this one.

"The Court: Well, he has answered that he has not. Whether he gave the statement to the government investigators or not is immaterial. Sustained. He has answered your question and on this particular one November 1949 he was not indicted.

\*　\*　\*　\*　\*　\*

"Q. Did you ever sell any cars prior to November 1949? A. I think I have.

"Q. How many? A. I would not know.

"Q. Receive checks on those transactions? A. Yes.

"Q. Where did you obtain those cars?

"Mr. Ward: Objection, your Honor.

"The Court: That goes too far. Sustained. As far as it may relate to this transaction, I want to give you a wide latitude. I do not get into any other transactions, since they are immaterial.

"Q. Did you change the numbers on other cars?

"Mr. Ward: Objection, your Honor, it is improper.

"The Court: Sustained.

"Q. How many cars in all have you handled that were stolen cars, driven from one state to another?

"Mr. Ward: I submit counsel knows that is an improper question.

"Mr. Herr: I do not know anything about that.

"The Court: A conviction of a felony.

"Mr. Herr: Then I have no further questions, your Honor."

\*　\*　\*　\*　\*　\*

the proceeds two ways. On cross-examination he was permitted to testify that he had never engaged in stealing cars before he talked to defendant in 1949; that he never saw Coulter prior to November, 1949; that that was his first experience with stolen cars. He then testified as to other visits to Coulter, when defendant was not with him, delivering cars on which defendant had changed the numbers, admitted that he sold a car to Coulter in July, 1950, when defendant was not with him; said that he didn't know of anyone who changed numbers except Wall and defendant; that he didn't go to Coon Rapids in early December, 1949, or sell Coulter a car on December 6, 1949; that he had pleaded guilty to this charge and others and had made statements to the F.B.I. twice, and that he expected no reward or leniency.

The errors urged by defendant with respect to Dybowski's cross-examination appear in the footnote.[3] Essentially the questions to which objections were sustained were, first, whether he had gone to Coon Rapids, Iowa, to sell cars with persons other than Lawinski. The court ruled

3. The specific questions propounded to Henry Dybowski and the allegedly erroneous rulings thereon are as follows:

"Q. Had you been to Coon Rapids on any occasion to sell cars other than with Edwin Lawinski? A. Yes.

"Mr. Ward: Objection, your Honor, it exceeds the scope of the direct examination and is not germane to the issues in this case.

"The Court: If it is during the same period, I will permit him to testify. During the time that he testified on direct you may inquire.

"Mr. Herr: Yes.

"The Court: But not beyond that.

* * * * * *

"Q. Did you have anybody at any time change the numbers other than Ed Lawinski?

"Mr. Ward: Objection to the form of the question, your Honor. Within the ruling that was just given by the Court, it is clearly objectionable.

"The Court: Yes. Confine to the time he may answer. I cannot hear.

"Mr. Herr: What was your Honor's ruling?

"The Court: During the period of time he testified on direct and within a month or so either way.

* * * * * *

"Q. And were those numbers changed?

"Mr. Ward: Your Honor, we will object to this because it is purely beyond the scope of the ruling as your Honor indicated, September, 1950.

"The Court: When was the last one he testified to on direct?

"Mr. Ward: June, your Honor.

"Mr. Herr: June, 1950.

"The Court: Yes, that goes beyond that.

* * * * * *

"Q. Did you ever have any girls go up with you? A. Not during that time, no.

"Q. On other occasions?

"Mr. Ward: Objection. That is improper.

"The Court: Sustained.

* * * * * *

"Q. How many cars in all did you sell to Coulter at Coon Rapids, Iowa? A. Nineteen.

"Mr. Ward: Objection, your Honor.

"The Court: Unless you confine it to this period.

"Mr. Herr: In every instance where you sold cars to Coulter at Coon Rapids, Iowa, was Ed Lawinski a partner?

"Mr. Ward: Objection.

"The Court: Again, confine it to the period of this indictment.

* * * * *

"The Court: If you have something other than that which you want to put in the record, or an offer of proof out of the presence of the jury, you may do it now.

"Mr. Herr: I offer to prove, if the court please, that the witness Henry Dybowski, stole and dealt in stolen cars from November 29, 1949, in a series of transactions embracing seventeen distinct dates as follows: October 14, 1950; June 28, 1950 (pen note 'should not have been included'); February 2, 1950; August 25, 1950; July 18, 1950; September 29, 1950; August 25, 1950; July 18, 1950; April 13, 1950; March 1, 1950; December 30, 1949, being occasions other than the ones named in the indictment on which the case is now being tried.

* * * * * *

"On oral argument counsel stated that the inclusion of June 28, 1950 in the foregoing list was an error and that there were not seventeen other offenses but ten."

* * * * * *

that it would permit such cross-examination if it related to the period within the charges of the indictment, not beyond that. The witness was then asked whether he had had anybody change numbers on automobiles other than Lawinski and the court limited him to the period covered by the indictment plus a month before and a month later. He was asked whether he ever went to see Wall with anybody other than Lawinski. The court limited the question to the period covered by the indictment. He was asked how many cars in all he had sold Coulter. He replied that he had sold 19. But the court confined the cross-questioning to the cars sold within the period covered by the indictment. The court also sustained an objection to an inquiry as to whether defendant had been a partner in all of Dybowski's transactions with Coulter, ruling that any transactions in stolen cars after the time mentioned in the indictment were immaterial and irrelevant.

All these questions related to matters wholly outside the indictment and wholly irrelevant to the question of whether defendant was guilty. They could have been justified only as attempts to impeach the credibility of the witness. Of course impeachment may always be shown by proof of statements by the witness other than those made on the stand and by evidence of conviction of crime. That the trial court was fully cognizant of the importance of complete cross-examination of Dybowski and Wall is apparent from its charge, in which it advised the jurors that they should be absolutely certain in their minds that Dybowski was telling the truth, that the testimony of each Wall and Dybowski was subject to grave suspicion and was to be acted upon with great caution and that they should convict the defendant only if satisfied of his guilt beyond all reasonable doubt not only from testimony of Dybowski and Wall but from all the evidence. With this charge the defendant expressed no dissatisfaction. In a similar situation the court said in Schwartz v. U. S., 56 App.D.C. 105, 10 F.2d 900, 901: "In the court's charge to the jury the rights of the defendant were carefully safeguarded, and the charge apparently was satisfactory to him, as no exception was noted. We have carefully considered, but found without merit, the various questions raised by the defendant in the separate brief filed by him."

Helen Ibsen was another witness whom defendant says he was not permitted to cross-examine sufficiently.[4] Questions asked her were as to whether she had gone to Madison with Dybowski to obtain fictitious titles to automobiles or whether she signed any applications for titles to automobiles at his suggestion. These in-

---

4. The specific questions and rulings pertinent are as follows:

"Q. Have you gone to Madison, Wisconsin, with Henry Dybrowski to obtain fictitious titles to automobile?

"Mr. Ward: We object to that.

"The Court: Sustained.

"Mr. Herr: Or licenses to automobiles?

"Mr. Ward: Objection.

"The Court: Same rule.

"Mr. Ward: Sustained?

"The Court: Sustained.

"Q. During the year 1950, did you at any time go to Madison, Wisconsin, with Henry Dybowski and make an application for titles to automobiles?

"Mr. Ward: Again, the repeated objection, your Honor.

"The Court: The same ruling.

"Mr. Herr: Did you ever sign any application for titles to automobiles that were applied for in Madison, Wisconsin, at the instance of Dybowski?

"Mr. Ward: Your Honor, because you sustained at least three objections to counsel's identical questions, we submit that counsel knows that that line of questioning is improper.

"The Court: Yes. Objection sustained to that last question and any further questions.

"Mr. Herr: If the Court holds that line of inquiry is improper I will refrain. I think the form may be.

* * * * * *

"Q. Did you ever sign any of the papers he typed up on that typewriter?

"Mr. Ward: Objection.

"The Court: If they were typed on the typewriter in your house, she may answer.

"A. I don't know if they were typed in the house.

"The Court: Did you ever sign any that were there? A. I signed them without knowing what I signed."

* * * * * *

quiries related in no way to matters about which she had been examined in chief and defendant does not suggest in what manner the evidence was material, relevant or otherwise proper on cross-examination.

We recognize that it is of the essence of a fair trial that reasonable latitude be extended to the cross-examiner, and that prejudice may ensue from a denial of the opportunity to place a witness in his proper setting and put the weight of his testimony and his credibility to a test. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. We realize also that at times, under the pressure of work in an over-loaded trial court, in a desire to speed up trials, there may be an involuntary tendency upon the part of the trial judge to restrict cross-examination unduly, thus endangering the validity of verdicts upon review. Defendant's protection at the hands of the court in this respect is of the utmost importance. Therefore, in view of the valuable rights involved and the tendency we have at times observed, we have given careful examination to the record here and scanned closely the testimony, upon both direct and cross examination, in an effort to assure ourselves that defendant's rights have been fully protected.

 We have observed that in each instance the questions to which objections were sustained were beyond the scope of the examination in chief, that they were not so framed as to constitute proper methods of impeachment, and that the court extended a liberal latitude to counsel for defendant in cross-examination. The rule in federal courts governing the proper scope of cross-examination has never been more simply stated than by Mr. Justice Story in Philadelphia & T. Ry. Co. v. Stimpson, 14 Pet. 448, 10 L.Ed. 535, in these words: "A party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination." In view of the universal acceptance of and adherence to this rule, it is unnecessary to mention the innumerable decisions repeating it. Illustrative is Sutherland v. U. S., 4 Cir., 92 F.2d 305, 308, where the court said: "His direct examination was confined to a de-

nial of the specific crime charged; and nothing is better settled than that a witness, whether a party or not, may not be asked questions as to irrelevant matters on cross-examination for the purpose of contradicting his answers and thus discrediting him. 70 C. J. 805; United States v. Dickinson, 25 Fed.Cas. [page] 850, No. 14,958, 2 McLean 325; Odiorne v. Winkley, 18 Fed. Cas. [page] 581, No. 10,432."

 Legal history has proved that the rule is conducive "to the systematic and orderly trial of causes." 5 Jones on Evidence 4579. However a well known exception to the rule is recognized, and that is that collateral matters may be gone into on cross-examination to a limited extent for the purpose of testing the witness' credibility. Thus, inquiries may properly be directed to the witness' interest, his motives, his prejudices or hostilities, his means for obtaining knowledge of the fact, his power of memory, his way of life, his associations and to any pertinent circumstances affecting his credibility. Within this exception also lie certain methods of impeachment, such as his statements contrary to his direct testimony, and convictions for crime.

 These relaxations of the general rule governing the proper scope of cross-examination, however, obviously cannot be defined with certainty to fit all occasions; their extent and limitations will depend upon the particular facts and circumstances of the case on trial. Generally, therefore, it is recognized that determination of where those limitations lie is within the sound discretion of the trial court. It is for the presiding judge to exercise a wise discretion in determining whether, considering the examination in chief, it is fit and proper that the questions presented be permitted or excluded. Storm v. U. S., 94 U.S. 76, 24 L.Ed. 42. All the decisions agree that the latitude allowed should be great enough to subserve ends of justice; but once fixed by the trial court it can not be deemed erroneous except where it is clear that that discretion has been abused, even though the discretion is necessarily vague in extent. It is a "sound, though undefined, judicial dis-

cretion, depending upon the circumstances of the particular case". Norfolk & S. R. Co. v. Fentress, 127 Va. 87, 102, 102 S.E. 588, 589. Thus, in Blitz v. U. S., 153 U.S. 308 at page 312, 14 S.Ct. 924, at page 925, 38 L.Ed. 725, the court said: "The question was clearly irrelevant, and was properly excluded. * * * If the object was to test the accuracy or credibility of the witness, it is quite sufficient to say that the extent to which a cross-examination may be allowed for such a purpose—especially where, as in this case, the question had no reference to any matter disclosed by the examination in chief—is largely subject to the sound discretion of the trial court, and the exercise of that discretion is not reviewable upon writ of error; certainly not where the question, upon its face, suggests nothing material to the inquiry whether the defendant is guilty or not guilty of the specific offense charged in the indictment." And in Jelke v. U. S., 7 Cir., 255 F. 264 at page 288, this court said: "There is certainly a limit to the extent that a witness may be cross-examined. Nor is it proper for an able counsel to convert a cross-examination into an argument to the jury.

"The trial judge is in the best position to determine how far the cross-examination should proceed, and, when convinced that the facts are all presented and fairly before the jury, the examination of a witness, either on direct or cross examination, should cease." See also Nashville Interurban Ry. v. Barnum, 2 Cir., 212 F. 634 at page 640; United States v. Hornstein, 7 Cir., 176 F.2d 217 at page 220; Radin et al. v. U. S., 2 Cir., 189 F. 568 at page 575; Resurrection Gold Min. Co. v. Fortune Gold Min. Co., 8 cir., 129 F. 668 at page 681; Harrold v. Territory of Oklahoma, 8 Cir., 169 F. 47 at page 53; Quigley v. U. S., 1 Cir., 19 F.2d 756 at page 759; Despiau v. U. S. Casualty Co., 1 Cir., 89 F.2d 43 at page 44.

Despite the exceptions to or relaxations of the general rule, relevancy to the direct examination can not be ignored; it is still essential. Thus the Court of Appeals for the Ninth Circuit in Dillard v. U. S., 141 F. 303 at page 310, held that a witness cannot be impeached by showing contradictory statements made by him which are not relevant to any issue in the case. This was followed by the Third Circuit in U. S. v. Hannon, 105 F.2d 390 at page 392, certiorari denied. See to the same effect Ridenour v. U. S., 3 Cir., 14 F.2d 888; Miller v. U. S., 3 Cir., 6 F.2d 463; Washington, etc. R. Co. v. Smith, 53 App.D.C. 184, 289 F. 582 at page 588.

 Upon full consideration of this record, remembering that the trial court was bound to exercise a sound discretion, examining the questions to which objections were sustained, the testimony of the respective witnesses on direct examination, the latitude extended by the court, we are unable to say as a matter of law that the court abused its discretion in its limitation on the cross-examination of any of the witnesses. None of the cases cited by defendant impinges upon the soundness of this conclusion.

The judgment is affirmed.