UNITED STATES of America,
Plaintiff-Appellee,

v.

Norton I. KRETSKE, Defendant-
Appellant.

No. 11065.

United States Court of Appeals,
Seventh Circuit.

March 18, 1955.

Rehearing Denied April 22, 1955.

Myer H. Gladstone, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., Chicago, Ill., Daniel P. Ward, Sp. Asst. to U. S. Atty., Chicago, Ill., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

DUFFY, Chief Judge.

Appellant was tried before a jury and convicted on the charge of violation of Title 18, U.S.C. § 2315.[1] The indictment charged appellant Kretske did receive, conceal and store certain goods, wares and merchandise of the value of more than $5,000 which were a part of and constituted interstate commerce, knowing the same to have been stolen. The goods, wares and merchandise were four paintings that had hung for a century or more on the walls of St. Joseph's Old Cathedral, Bardstown, Kentucky.

The evidence established that during the night, November 12–13, 1952, nine paintings were stolen from St. Joseph's Old Cathedral, Bardstown, Kentucky. During the burglary the paintings were cut from their frames. The exhibit numbers in the trial below and the names of the paintings were: Exhibit 1—The Immaculate Conception; Exhibit 2—The Descent of the Holy Ghost; Exhibit 3—The Crowning of the Blessed Virgin Mary; and Exhibit 4—The Flaying of Saint Bartholomew.

Although defendant alleges numerous errors, he devotes much time and effort to his contention that the government did not prove the paintings had the jurisdictional value of $5,000, and that the trial court admitted prejudicial evidence on the question of value.

Exhibit 1, painted about 1850 by a Bardstown artist, was, admittedly, of little value. But a decided difference of opinion as to the value of Exhibits 2, 3 and 4 was expressed by witnesses for the government and those offered by the defendant. It was shown by tradition and reputation and from records in the Cathedral these three paintings, together with some others not involved in this case, were gifts to the Cathedral in the early 1800s by Louis Philippe, King of the French, and Francis the First, King

1. "§ 2315. Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, * * * which constitute interstate or foreign commerce, knowing the same to have been stolen, * * *.

* * * * *

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

of the two Sicilies and Naples. For many years prior to the theft of the paintings inscriptions appeared immediately beneath the paintings informing the public that the paintings were gifts from the two kings mentioned. It was admitted that none of the paintings had ever been sold. Credible testimony was received that Exhibit 4, The Flaying of Saint Bartholomew, was the work of the well-known Italian artist, Mattia Preti.

When defendant was endeavoring to sell the four paintings to the F. B. I. under-cover man, Lafitte, who posed as a prospective purchaser of stolen paintings, Kretske placed a value of $100,000 on the four paintings. After considerable negotiation Kretske agreed to a sale for $40,000. At the trial he offered testimony that the paintings were of little or, at least, insignificant value.

 We think the government adopted a proper method of establishing the value of these four paintings. It produced an impressive array of art experts who testified as to the artistic merits of the paintings and who gave their opinions as to the price these paintings would bring if they were offered for sale. Of course, different paintings by a single artist may vary in artistic excellence although creations by the Old Masters or other well-known artists whose work is consistently and usually of high merit, would ordinarily have a higher sale price than a similar painting executed by an unknown artist. Therefore, the government quite properly solicited the opinions of highly qualified art experts.

The following witnesses testified for the government as to the value of the paintings: Kenneth Donahue, who had been associated with the Frick Art Collection in New York and the Museum of Modern Art in New York. He was there a lecturer and research assistant in the history of art, especially in 17th Century paintings. At the time of the trial, he was curator of the famous Ringling Museum at Sarasota, Florida, and by chance, had been familiar with the paintings, Exhibits 1, 2, 3 and 4, since childhood. Irving S. Tarrant, an art appraiser, is a special curator at the Art Institute in Chicago. He has been in the Fine Arts field since 1928. For many years, he was employed by the American Appraisal Company with particular reference to the appraisal of fine arts. He knew of a Preti painting being offered for sale in New York for $6,000. Patrick Thomas Malone is an assistant curator of the Art Institute at Chicago. His special field of interest was 17th and 18th Century Italian paintings. He has studied art abroad and on his most recent trip to Europe examined twenty to thirty paintings by Mattia Preti. Frederick Arnold Sweet is a curator of the Art Institute of Chicago. He was former director of the Art Museum in Portland, Oregon, and Curator of Renaissance Art at the Brooklyn Museum in New York. He made eight trips abroad in his study of art. Each of these experts testified that the paintings in question were of a value in excess of $5,000. On this appeal we must consider the evidence most favorable to the government. Clearly the jury was entitled to find that the value of the four paintings together was in excess of $5,000. Defendant's claim of error on the question of value of the paintings is entirely without merit.

 Defendant asserts prejudicial error because of claimed undue restriction in the cross-examination of government witnesses, Jean Lafitte, Gene M. Norris and Francis J. Stefenak. We find similar objections on most of the appeals to this Court in criminal cases irrespective of the district judge who presided at the trial. It may, therefore, be appropriate to briefly state once more the applicable legal principles.

This question was discussed by this Court in United States v. Lawinski, 195 F.2d 1. We pointed out that the precise extent of permitted cross-examination cannot be stated rigidly but that, at page 7: " * * * It is for the presiding judge to exercise a wise discretion in determining whether, considering the examination in chief, it is fit and proper

that the questions presented be permitted or excluded. Storm v. United States, 94 U.S. 76, 24 L.Ed. 42. All the decisions agree that the latitude allowed should be great enough to subserve ends of justice; but once fixed by the trial court it can not be deemed erroneous except where it is clear that that discretion has been abused, even though the discretion is necessarily vague in extent. * * *

" 'The trial judge is in the best position to determine how far the cross-examination should proceed, and, when convinced that the facts are all presented and fairly before the jury, the examination of a witness, either on direct or cross examination, should cease.' " Other pertinent comment in decisions by this Court appear in United States v. Glasser, et al., 7 Cir., 116 F.2d 690, 702; United States v. Hornstein, 7 Cir., 176 F.2d 217, 220; United States v. Lutwak, 7 Cir., 195 F.2d 748, 755.

▆▆ For more than 100 years the rule in the Federal Courts has. been that the scope of cross-examination is limited to subject matter referred to during the examination in chief and if a person wishes to examine a witness regarding other matters he must do so by making the witness his own. Bell v. United States, 4 Cir., 185 F.2d 302, 310. Defendant's main complaint with reference to limitations of cross-examination pertains to the witness Lafitte. An examination of the record discloses that defendant's counsel was permitted to inquire with great particularity into his conversations and his transactions with Kretske. The instances where the Court limited the proposed cross-examination were on collateral matters which were beyond the scope of the direct examination and, indeed, in most instances, not relevant to the proceedings. Defendant could have called Lafitte as his own witness or might have requested the Court to call him as the Court's witness but he did neither. We hold there was no prejudicial error because of the restric-

tion in the cross-examination of the witnesses Lafitte, Norris and Stefenak.

Appellant asserts error because of the denial of his motion to vacate the judgment of conviction. Appellant claims that newly discovered evidence would disclose that Lafitte testified falsely and that the prosecuting officers knew or should have known of such perjury.

On direct examination Lafitte testified that he was a special investigator for the Federal Bureau of Narcotics and had been so employed for about three years. He also testified that he had worked for the Federal Bureau of Investigation in New York on the paintings case.[2] Appellant complains that the Court would not permit his counsel to cross-examine Lafitte about various past activities and that at one point the Court sustained a question on cross-examination on the government's objection, "It is a matter of public interest in which there are certain matters that should not be disclosed." Appellant now claims that it can produce evidence of a criminal record by Lafitte apparently dating back a number of years.

It is understandable why appellant makes such a bitter attack upon Lafitte. Acting under instructions of the F. B. I. he fooled Kretske completely. After the sale price of $40,000 had been agreed upon, Kretske led him to the place in Chicago where the paintings were being kept and exhibited same to Lafitte. It was also Lafitte who gave the prearranged signal to the F. B. I. which led to the seizure of the stolen paintings in the possession of the appellant.

▆ Appellant contends that the newly discovered evidence would affect the credibility of Lafitte. But new trials are not ordinarily granted where the newly discovered evidence is merely of an impeaching character. Slappey v. United States, 5 Cir., 110 F.2d 528.

In Gage v. United States, 9 Cir., 167 F.2d 122, 125, in support of a motion for a new trial, appellant furnished an affi-

---

2. Lafitte was in New York when Kretske first called him from Chicago by long dis-
stance telephone and spoke to him about the paintings.

davit to the effect that the principal government witness had twice been convicted of theft. The court there said: "* * * The mere discovery of additional impeaching evidence does not meet the requisites for a new trial." In Lawrence v. United States, 90 U.S.App. D.C. 422, 196 F.2d 48, the court held there was no error by the trial court in denying a motion for a new trial based on the discovery that a prosecution witness had a criminal record.

■■■ It is fundamental that in a motion for new trial on the grounds of newly discovered evidence, there must be a showing that the evidence is not merely cumulative or impeaching; that it must be material to the issues involved; and it must be such that on a new trial the newly discovered evidence would probably produce an acquittal. We hold that, in the instant case, there was no abuse of discretion in denying appellant's motion for a new trial on the ground of newly discovered evidence.

We have carefully examined appellant's claims (1) that the Assistant United States Attorney made prejudicial statements to the jury, and (2) that remarks of the court in the presence of the jury during the trial were prejudicial. Appellant asserts that the statements complained of were of such a nature as to require a reversal of the judgment of conviction. We hold that these objections are without merit and cannot be sustained. We find no prejudicial error in this respect.

■■■ Appellant asserts error because of instructions given by the Court and also because the Court refused to give instructions tendered by appellant. We doubt that there was any sound basis for such objections, but in any event we think the objections were waived. Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A. provides in part: "* * * No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury." Appellant made no objection at the conclusion of the charge to the jury and thus did not comply with Rule 30. In United States v. Sutter, 160 F.2d 754, 757, this Court said: "No question is presented as to the instructions as it is not shown that before the jury retired the defendant objected to the refusal to give the instructions he requested, stating distinctly the matter to which he objected and the grounds of his objection, as required by Rule 30 of the Federal Rules of Criminal Procedure, * * *."

■■■ It appears that the proposed instructions were considered at a conference in chambers between the attorneys for the parties and the trial judge sometime during the course of the trial. However, any objections or suggestions there made would not be a compliance with Rule 30. When it came time to give the instructions, the court would not know whether the previous objections or suggestions were still being urged. We think it would be a substantial compliance with Rule 30 if, after the instructions were given, counsel made specific reference to his previous suggestions or objections, and that he was still insisting thereon. This was substantially the plan worked out by the trial court and approved by the Court of Appeals in the Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 210 F.2d 732, 744.

■■■ Defendant obliquely refers to the question of whether the paintings had ceased to be in interstate commerce before coming into his possession. This question was not raised in defendant's statement of points. It was not listed as a contested issue on this appeal nor urged as a ground for reversal. However, defendant did contend that the Court erred in excluding the testimony of a telephone company's supervisor that seven long distance calls were placed between March 12, 1953 and March 26, 1953 at Kretske's office for the residence

of Mrs. David Lentz in Joliet, Illinois. Defendant urged that this testimony would somehow prove that the paintings had reached the end of their interstate journey before defendant obtained possession of the same.

Defendant had testified that Mark Rattner had made a number of telephone calls from defendant's office to Mrs. Lentz in Joliet, Illinois, but the supervisor had no knowledge of the subject matter of any of the telephone conversations. Whether certain 'phone calls were or were not made was no evidence as to whether the paintings in evidence were or were not in interstate commerce. Defendant made no effort to produce the testimony of Rattner or of Mrs. Lentz. We think that the Court properly excluded the testimony of the telephone supervisor.

We have considered the other questions which defendant has urged for reversal but to which we have not specifically referred. We deem them to be without merit. As we find no reversible error in this record, the judgment of conviction is

Affirmed.