**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Salvatore BATTAGLIA and Dave Evans,
Defendants-Appellants.**

**Nos. 16312, 16313.**

United States Court of Appeals
Seventh Circuit.

Jan. 9, 1968.

---

306

John Powers Crowley, Maurice J. Walsh, Anthony V. Champagne, Raymond J. Smith, Morris A. Haft, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., Gerald M. Werksman, Asst. U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, Asst. U. S. Atty., of counsel.

Before SCHNACKENBERG, SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

In February 1967, defendants Dave Evans, Salvatore Battaglia and Joseph Amabile were indicted for conspiring with each other and with non-defendant Rocco Pranno to violate the Hobbs Act.[1] The gist of the conspiracy charge was that defendants obtained $48,500 from the Riley Management Corporation by extortion. As required by the statute, the indictment also charged that the conspiracy affected interstate commerce, particularly with respect to that firm's construction of the King Arthur Apartments in Lansing, Illinois. The three defendants were found guilty by a jury. Evans' and Battaglia's appeals were heard together and are disposed of in this opinion. Amabile's appeal has not yet been heard.

■ Because Evans and Battaglia assail the sufficiency of the evidence, it must be summarized in some detail, viewed in the light most favorable to the Government. The evidence showed that William Riley was president of the Riley Management Corporation and that his company was building the King Arthur Apartments in Lansing, Illinois. Since 1962, defendant Evans had been one of his superintendents of construction and was assigned to the Lansing job in June 1964. At that time Riley and Evans discussed letting the sewer contracts for the Lansing apartments. Riley told Evans to line up subcontractors but to keep it secret "from the boys in Melrose Park," specifically from defendant Amabile (also known as Joe Shine) and from Nick Palermo. Riley told Evans that if Amabile and Palermo learned of the project, Riley would quite possibly be forced to use them again as subcontractors. Amabile had been connected with earlier Riley projects and had on several occasions threatened Riley and his family. Evans promised to keep the King Arthur Apartment information from Amabile and Palermo. However, a few

1. In pertinent part, the Hobbs Act provides (18 U.S.C. § 1951):

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

\*    \*    \*    \*    \*

"(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

days later, Riley was requested to go to the office of the Melrose Park Plumbing Company to meet Nick Palermo. Riley acceded. Both Palermo and Amabile were at the meeting. Palermo insisted on their receiving the plumbing contract for the Lansing project. Amabile said that otherwise he would stop Riley's other apartment building projects underway in Northlake and Westmont, Illinois, and that Riley "would be walking the streets with a candy cane." They told him they knew where Riley's mother lived and where his children went to school and that they had a baseball bat to handle "wise guys" like him.

A few days later, Riley complained to Evans about the leak to Amabile and Palermo. Riley told Evans that the Melrose Park group was not to receive any Lansing work from Riley Management Corporation. In August 1964, Riley instructed Evans to obtain a sewer contractor that was "foreign" to Amabile and Palermo.

Amabile had told Mike DiVito, a sewer contractor, that Amabile could not get the Lansing sewer work if DiVito's name were to be on the contract. Amabile advised DiVito and co-conspirator Rocco Pranno to come up with "a good clean fellow" if they were to obtian the business. They suggested Henry La-Key, an experienced construction foreman. In September 1964, La-Key was hired by Pranno and DiVito as construction superintendent for a brand-new firm, Carlson Construction Company, with the title of president.

DiVito said he and Pranno met with Evans and Amabile at Amabile's apartment in mid-September.[2] Pranno explained to Amabile that La-Key was "clean," but Amabile said that before giving Pranno and DiVito the Lansing sewer job he wanted $20,000 in cash. After looking at Evans' figures, DiVito told Pranno that there would be $20,000 in cash above Pranno's and DiVito's costs and profits for the job. Thereupon Pranno told Amabile that he would give him the $20,000 in cash and Amabile accepted the deal. Afterwards, Pranno told DiVito that Evans was Amabile's "guy" and that DiVito should never say anything in front of Evans because it would get back to Amabile.

La-Key testified that he attended a September meeting at Amabile's apartment with Evans, DiVito and Amabile. Amabile said that he was giving the Lansing sewer job to DiVito and Pranno and cared about nothing except getting his $20,000 "off the top." In La-Key's presence, DiVito later relayed the message to Pranno about Amabile's demand for $20,000. Pranno directed La-Key and DiVito to meet with Amabile and Evans at the El Morocco lounge. At that meeting DiVito told Amabile that there would not be enough money in the contract to pay him $20,000 "off the top." Amabile then instructed Evans to figure a way to obtain more money from the job. Evans tore up the original contract and wrote a new contract, raising the price from $150,000 to $199,600.

Pranno gave DiVito and La-Key approximately $13,000 to open a bank account for Carlson. In September 1964, Evans advised Riley that he had selected the Carlson Construction Company as the sewer contractor, that its reputation was excellent, and that it was operated by Henry La-Key. Thereafter, Carlson Construction Company was awarded the sewer contract for about $150,000, to be paid directly to Carlson by a suburban savings and loan association through pay-out slips issued by Riley's company. Carlson commenced the Lansing work in September or October 1964.

In mid-October, Evans told La-Key that the only contracts Evans let at Lansing were the ones Amabile told him to. Evans told La-Key that he did not want Riley to know that Evans knew Amabile. In November, Amabile told La-Key that Evans worked for Amabile, that Amabile had placed Evans in Riley's office, and that Evans would do whatever Amabile told him to do.

2.  This may be the same Amabile apartment meeting described infra by La-Key.

Before making the first draw from the savings and loan association, La-Key told Amabile that the draw would be for $57,000. The next day, Amabile and Le-Key drove to the hospital where Evans was a patient. Amabile told La-Key that Amabile was going to give $5,000 to Evans as his cut on the job, instead of $7,500. At the hospital Amabile gave Evans a "wad of bills." Evans reduced the estimate for the first draw by approximately $10,000.

On November 12, 1964, La-Key received the first draw for $47,517.97 from the savings and loan association. He deposited $39,000 in Carlson's payroll account, retained $517 for his wages, and gave $8,000 to Rocco Pranno. Three days later, on Amabile's instructions, he drew out $20,000 from Carlson's account and gave it to Amabile.

In late November or early December, La-Key accompanied Amabile to a farm in Pingree Grove, Illinois, where Amabile introduced La-Key to Battaglia as "running the job for them" in Lansing, Illinois. La-Key heard Battaglia ask Amabile why Evans was getting "that kind of money." Amabile explained that he had made a deal with Evans who had "got us the job." Amabile also said he had promised Evans $7,500 and that he would take care of it. The next morning La-Key mentioned to Evans that he had been at Battaglia's farm, and Evans warned him not to talk about it. Later, Pranno explained to Amabile that La-Key should not have been taken to the farm. When Pranno attemped to hit La-Key, Amabile stopped him, saying that he had La-Key down to the farm and that "the man [Battaglia] says he is OK."

Prior to the first draw, Pranno, Di-Vito and La-Key borrowed $5,000 because Carlson had run short of money. Pranno gave $4,500 of this amount to La-Key to deposit for Carlson. This loan was not repaid by January 1965. Later that month Pranno told Amabile about this in DiVito's presence and asked Ama-

bile to locate La-Key so that the loan could be repaid. Several days later Pranno told Amabile that he was going to "the farm" to see "the man" in order to have Amabile obtain $5,000 from La-Key to pay back the loan. At the resulting Battaglia farm meeting, attended by Amabile, Pranno and DiVito, Pranno mentioned that $20,000 from the Lansing sewer job was intended for Battaglia, who then nodded. The second time the $20,000 was mentioned for Battaglia, he said "yes." Battaglia also said:

"'Well, I don't think Hank La-Key is such a bad guy, I like him, I like to work with him,' that they had other things coming up, and that they could use him again because he was clean."

He told Pranno that he would see what he could do for him as to the $5,000. On the drive back from the farm, Pranno told DiVito that he thought Amabile was short-changing Battaglia and keeping $10,000 of the $20,000 for himself.

In January 1965, La-Key advised Evans that Carlson did not have enough money to pay for necessary materials. Evans told La-Key not to worry, saying:

"'I will talk to Joe Shine [Amabile] and Joe Shine will talk to the man [Battaglia or Riley [3] ]. We will see that the money is in the bank for you.'"

That same month Amabile told La-Key to prepare the papers for the second draw. La-Key said that the second draw would be for $60,000. Amabile said this was too high and that he would determine how much it should be and would straighten it out with Evans. That same night, Evans went to La-Key's home and changed prices to bring the draw down to $48,000. Evans told La-Key to present the second draw papers to Sol Meltzer, Riley's financial officer. However, Meltzer refused to authorize this draw. Thereupon, La-Key went to see Amabile. Evans was present while La-Key told Amabile what had happened. The next morning La-Key picked up Evans. They

3. In other instances in the record, the evidence supports a finding that the expression "the man" refers to defendant Battaglia.

entered Riley's office separately. Riley said that he would authorize a pay-out only when Carlson had paid its suppliers. At this meeting La-Key told Riley that the cost of the job had gone up to $200,000. Evans explained that this was because "complications set in on the job."

La-Key thereupon reported to Amabile that the second draw was still not authorized. Amabile told La-Key to accompany him to Riley's office the next morning. On the following day Amabile told Riley that he had to pay La-Key because "the man" [Battaglia] wanted La-Key paid. Amabile said that otherwise there would be "all sorts of trouble." Because of his fear of physical harm and economic collapse, Riley authorized the second draw of $48,512.48. This was the sum mentioned in the indictment and was deposited by La-Key in a Carlson account. A few days later, Amabile instructed La-Key to draw out $17,000. La-Key thereupon obtained $5,000 in cash and a certified check for $12,000. Amabile insisted upon all cash and ordered Evans to accompany La-Key to cash the check. After the $12,000 check was cashed, La-Key and Evans went to Amabile's apartment, and La-Key gave Amabile the $17,000. Amabile then gave La-Key $5,000, of which La-Key gave Evans $1,000. Amabile told La-Key to take a vacation, and he went to Florida. Shortly thereafter, Evans advised La-Key to return to Chicago, at Amabile's request. Amabile then complained that La-Key had not been paying Carlson's bills, thus getting Amabile in trouble with Riley and " 'making Dave Evans lose his job. You are taking my man [Evans] right out of Riley's.' " La-Key then told Amabile that there was no money in the Carlson account because Amabile had bled it.

A few days later, La-Key complained to Evans that the Carlson bills were unpaid because of Amabile's actions. La-Key asked Evans why he didn't get out of the business. Evans replied:

" 'I can't get out. I am in too deep with Joe Shine [Amabile]. I know too much about the other people. * * * I can't quit. I wish I could get back to my own job where I came from.' "

Evans then said that he wished he had never met Amabile and reiterated that he was in too deep to quit.

*Sufficiency of the Evidence as to Evans*

█ Evans and Battaglia concede there was enough evidence of a conspiracy to obtain money from Riley Management Corporation by fraud. Evans admits that there was sufficient evidence that he was a party to that conspiracy. He also admits that Amabile used extortion to induce Riley to authorize the second draw. However, Evans contends that there is no evidence to show that the extortion was pursuant to a conspiracy of which he was a member. We reject that contention.

On this record, it is obvious that Evans knew of Riley's fear of Amabile. Although Evans took the stand, he significantly never explained that violence was not contemplated. La-Key was told by Evans that he would talk to Amabile, and that Amabile would talk to "the man" (Battaglia or Riley in this instance; see note 3 supra) in order to get the second draw paid. Evans knew that Riley was unwilling to pay the second draw because Carlson's bills were unpaid, and that Riley was afraid of Amabile. The jury could properly infer that Evans knew Amabile would induce Riley—through fear—to authorize the second draw. After the second draw, La-Key withdrew another $17,000 for Amabile, who then gave La-Key $5,000, who in turn gave Evans $1,000.[4] Even though he may not have spoken to Amabile about the second draw, Evans' own statement to La-Key showed his willingness to take part in a course of action which would cause payment by coercion. It would be unreasonable to suppose that Evans would be so closely associated with Amabile in the scheme to defraud without realizing that Amabile would employ coercive means for obtaining the second draw. Cf. Pereira v. United States, 347 U.S. 1,

---

4. Previously, according to La-Key, Evans had received another "wad of bills" from Amabile.

12–13, 74 S.Ct. 358, 98 L.Ed. 435. As in *Lefco v. United States*, 74 F.2d 66, 68, 69 (3rd Cir. 1934), Evans has resorted to a conspirator's common contention, made in extremity, that he was a party to a sub-conspiracy not charged in the indictment, but our digest of the evidence discloses evidence quite sufficient to sustain the allegations and finding of his participation in a single conspiracy to obtain money, encompassing extortion as well as fraud.

■ Evans has relied on *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252; *United States v. Critchley*, 353 F.2d 358 (3rd Cir. 1965), and *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963), certiorari denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498. None is apposite. In *Stirone,* the Court condemned the variance between indictment and proof. As we have seen, the proof here is consistent with the indictment. In *Critchley*, the evidence did not show any threat at the critical time, so that there was no extortion. Here there was ample evidence that co-conspirator Amabile threatened Riley with violence to obtain the second draw, and of course Evans is chargeable with his co-conspirator's acts in furtherance of the conspiracy.[5] In *Carbo*, Gibson had legitimate business reasons for his association with the conspirators, whereas Evans' associations with Amabile were clearly for illegal purposes.

*Sufficiency of the Evidence as to Battaglia*

■ As noted above, during DiVito's, Pranno's and Amabile's February (or early March) 1965 visit to Battaglia's farm, Battaglia said he liked La-Key and they could use him in other things because he was clean. From this, the jury could infer that Battaglia had embarked "upon a criminal venture of indefinite outline" (*United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1944)). He was committed to a long-term relationship contemplating the use of La-Key in numerous ventures. Battaglia admitted knowledge of Evans' paid role. He also acknowledged that he was to receive a $20,000 cut from Riley through the Carlson contract at Lansing. Since Battaglia had a stake in the outcome of the conspiracy, even the stringent test of conspiracy liability evolved by Judge Learned Hand in *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940), affirmed, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, was satisfied. Battaglia was also the arbiter of disputes among the co-conspirators. Being an associate of Amabile in this venture, Battaglia is properly chargeable with knowledge that his confederate, Amabile, would resort to threats if necessary to extract money from Riley. Battaglia had to "take his chances" as to the methods used by the other co-conspirators. *United States v. Andolschek, supra.* As in *United States v. Kahaner*, 317 F.2d 459, 468, note 4 (2d Cir. 1963), certiorari denied *sub nom. Corallo v. United States*, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65, "there was ample evidence to raise a question for the jury whether he had joined in the conspiracy; if the jury so found, he [a co-conspirator who held the bribe money] was criminally responsible for the acts of the other conspirators and his own failure to perform more than a few overt acts would be immaterial." Evidence of knowledge of the details of the plan or of participation of others is not required. *United States v. Hickey*, 360 F.2d 127 (7th Cir. 1966), certiorari denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed. 2d 210.

*Intent to Affect or Knowledge of Effect on Interstate Commerce*

■■ Battaglia insists that it was necessary to find that he intended to affect or had knowledge that the conspiracy would affect interstate commerce, and that there was insufficient evidence of such intent or knowledge. A similar argument was rejected in *United States v. Varlack*, 225 F.2d 665, 672 (2d Cir.

---

5. *United States v. Sansone*, 231 F.2d 887, 892 (2d Cir. 1956), certiorari denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500.

1955). As we recently held in United States v. Pranno, 385 F.2d 387 (7th Cir. 1967):

"All that must be proved, however, is that defendants conspired to commit extortion, and that the natural effect of carrying out their threat, whether they were conscious of it or not, would affect commerce."

The District Court charged the jury that "all that is necessary is that the natural effect of the acts committed pursuant to the conspiracy was to affect, delay or obstruct [interstate] commerce," and that the requisite effect on commerce would be found if the jury believed "beyond a reasonable doubt that the defendants' activities as shown by the evidence in any way or degree obstructed, delayed or affected commerce." These instructions were proper under the Hobbs Act. Neither Battaglia nor Evans argues that the extortion would have no effect on interstate commerce. Here, one of the means to accomplish the extortion was the threat otherwise to cause Riley Management Corporation "all sorts of trouble." Many interstate deliveries were being made to its Lansing project. If Amabile's threats to destroy Riley had been carried out, this interstate commerce would necessarily have been obstructed. The Hobbs Act covers such a situation. United States v. Pranno, supra. Furthermore, the Riley company's reserves were depleted by the extortion. Since its business depended, in part, on ability to pay for interstate shipments to the Lansing site, the jury could infer that the extortion would have an effect on interstate commerce. Under the language of this statute (see note 1 supra), that is a sufficient nexus with interstate commerce.

*Denial of Bill of Particulars*

■ Evans' briefs do not contest the denial of requests Nos. 2 and 3 in his motion for a bill of particulars.[6] However, Battaglia adopted these requests and argues that the District Court erroneously denied them. Specifically, Bat-

taglia asserts that he was entitled to information about the 1962 and 1963 Palermo-Amabile threats to Riley with respect to his Northlake and Westmont, Illinois, projects. But requests Nos. 2 and 3 provide:

"2. State the acts or things done by the petitioner [Evans and, by adoption, Battaglia] by which he and the other named and unnamed persons, combined, confederated and agreed together to obstruct, delay and affect commerce as charged.

"3. State the dates, times and places when and where the alleged acts set forth in paragraph 2 above were done or performed."

Even if the District Court had ordered the Government to answer these requests, the Palermo-Amabile threats would not have been revealed. Since Battaglia did not ask for this information below, he may not assert error in this respect. Furthermore, none of the *five* requests in the motion for a bill of particulars covered this subject matter. Therefore, the Government was not required to respond as to it. No abuse of discretion has been shown with respect to the partial denial of this motion. Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545.

*Conspiracy Instruction*

■ During the early portions of the trial, the District Court refused to permit the Government to have the defendants' declarations considered against all of them. Later in the trial, upon motion of the Government, the Court instructed the jury as follows:

"Before we proceed with the taking of further testimony in this case, I have a direction and instruction to give you, to make to you.

"You will recall during the course of this trial certain testimony was admitted in evidence only as to one or more of the defendants, and you were instructed at that time that such evidence was not then to be considered

---

6. The other three requests were granted and the Government answered them.

against any defendant to whom the evidence did not pertain.

"It is now my responsibility under the law, to instruct you that such evidence is admissible against all of the defendants as evidence in connection with the alleged conspiracy charged in the indictment, whether or not each of the defendants was present when the acts or conversations or incidents testified about were done or carried on.

"You may consider then such evidence as pertaining to all of the defendants."

Citing United States v. Pronger, 287 F.2d 498 (7th Cir. 1961), Battaglia complains that this instruction was a direction to the jury that a conspiracy had been proven and that each defendant was a member of that conspiracy. However, the last paragraph of this instruction referred to "the alleged conspiracy" and did not tell the jury that the Government had proved a conspiracy. A later instruction made it plain that the jury could not consider acts and declarations of one conspirator against the others unless the jury found the existence of a criminal conspiracy and that the acts and declarations were in furtherance of the conspiracy.

The *Pronger* case is not controlling here. The terms of the instruction in that case were dissimilar to those here, and any defect in that instruction was apparently not cured by a later instruction. Conspiracy instructions similar to those here were approved in United States v. Bernard, 287 F.2d 715, 719–720 (7th Cir. 1961), which reinforces our conclusion that the later instruction made the risk of prejudice too slight to justify reversal. *Pronger* has been confined to a situation where the erroneous instruction was in effect given as part of the charge and does not apply where, as here, trial time intervened between the assailed comments and the final, proper charge. United States v. Allegretti, 340 F.2d 254, 256 (7th Cir. 1964,

en banc), certiorari denied, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433.

Battaglia claims that the jury was not told that it could not consider acts or declarations of a co-defendant made outside the presence of a defendant against the absent defendant unless it found that a conspiracy existed and that the acts and declarations were in its furtherance, but an examination of the transcript shows that such an instruction was given.

*Admission of Pre-indictment Threats Made by Amabile and Palermo and Admission of Statements of Co-conspirator Pranno*

██ Battaglia also asserts that the District Court erroneously admitted Riley's testimony of 1962–1963 threats by Amabile and Palermo and erroneously admitted Pranno's statements outside the presence of the defendants. We agree with the Government that the Palermo-Amabile threats were relevant to show the reasonableness of Riley's fear when confronted with Amabile's demand to authorize the second draw. The District Court carefully instructed the jury that this testimony was limited to that purpose (Tr. 2564).

██ As to Pranno, the evidence concerning his January 1965 visit to Battaglia's farm, as well as other evidence previously summarized, shows that he was a co-conspirator of Battaglia and Amabile, so that La-Key's and DiVito's testimony concerning Pranno's statements outside the presence of defendants was properly received.

*Accomplice Instruction*

██ Battaglia complains that the District Court's accomplice instruction advised the jury that DiVito and La-Key were accomplices. The instruction was as follows:

"I must tell you, ladies and gentlemen of the jury, that an accomplice is one who unites with another person in the commission of a crime voluntarily and with common intent. An accomplice does not become incompe-

tent as a witness because of participation in the criminal act charged. On the contrary, the testimony of an accomplice alone, if believed by you, may be of sufficient weight to sustain a verdict of guilty even though not corroborated or supported by other evidence. However, you should keep in mind that such testimony is to be received with caution and weighed with great care. You should not convict any defendant upon the unsupported testimony of an accomplice unless you believe the unsupported testimony beyond all reasonable doubt."

This instruction does not say or imply that DiVito and La-Key were accomplices. The instruction obviously means that if a person is found to be an accomplice, his testimony should be scrutinized with special care. A similar instruction has been proposed by Judge Mathes for the use of the District Courts. 20 F.R.D. 244. Such cautionary instructions were advocated in United States v. Bucur, 194 F.2d 297, 305 (7th Cir. 1952); Wainer v. United States, 82 F.2d 305, 308 (7th Cir. 1936), affirmed, 299 U.S. 92, 57 S.Ct. 79, 81 L. Ed. 58, and Ruvel v. United States, 12 F.2d 264, 265 (7th Cir. 1926). Battaglia relies on United States v. Balodimas, 177 F.2d 485, 487 (7th Cir. 1949), but there the district judge termed two named witnesses as accomplices. Here the jury had already been instructed that it was the exclusive fact finder, and there was sufficient evidence from which the jury could find that La-Key and DiVito were accomplices of the defendants. In this setting, the giving of this instruction was not erroneous.

*Restriction of Cross-examination and Refusal to Admit Defense Exhibits*

Battaglia assails the District Court's rulings restricting the cross-examination of DiVito, La-Key and Riley; he also assails the court's refusal to receive certain defense exhibits. A study of the cross-examination of these witnesses shows that the District Court allowed defense counsel considerable latitude.

■■■■■■ Battaglia's counsel attempted to show that a tax indictment had been dismissed against DiVito in return for his agreeing to be a government witness in this case. Battaglia's counsel cross-examined DiVito extensively about a "deal" to drop the income tax charge if DiVito testified for the Government in the instant case. Later the First Assistant United States Attorney in Chicago testified that the reasons for the Government's dismissal "were that Mr. DiVito's lawyer served us with that motion showing that he had paid his taxes, attaching the check and the receipt and it was obvious that we had no case * * *." [7] He also testified that the Assistant United States Attorney in charge of the DiVito case was satisfied that proof the tax had been paid in 1964 was a defense to that indictment. If Battaglia's counsel was still not satisfied why the DiVito indictment was dismissed, he could have also called the Assistant United States Attorney in charge of that matter.

The District Court refused to permit the defense to put into evidence the court file and docket entries relating to DiVito's tax case, but they were merely cumulative and did not reveal any "deal." Hence their exclusion was not prejudicial to Battaglia.

■■■■■■ Battaglia endeavored to show that La-Key was responsible for the "milking" of the Carlson Construction and Equipment Company. The defendants were given ample opportunity to examine La-Key regarding the balances in the Carlson bank accounts. The District Court did sustain the Government's objection to certain checks. But Bat-

---

7. By allowing this testimony, the trial judge acted consistently with the rule that bias or interest of a witness is not a collateral issue, and that extrinsic evidence is admissible thereon. United States v. Lester, 248 F.2d 329, 334-335 (2d Cir. 1957); 3 Wigmore on Evidence (3rd ed. 1940) §§ 948-950, 1005(b); McCormick on Evidence (1954) § 40, pp. 85-86.

taglia was not prejudiced by this ruling, for the checks were already reflected by ledger sheets that had been received, thus enabling Battaglia's counsel to argue that La-Key had looted the Carlson Company for his own personal gain. In addition, the checks were being offered in an attempt to contradict a witness on a collateral matter not relating to the $48,500 allegedly extorted. This is impermissible. United States v. Masino, 275 F.2d 129, 133 (2d Cir. 1960); United States v. Sweeney, 262 F.2d 272, 276–277 (3rd Cir. 1959). 3 Wigmore on Evidence (3rd Ed. 1940) § 979. Prior contradiction may be shown only on a matter material to the substantive issues of the trial. Gordon v. United States, 344 U.S. 414, 420, note 13, 73 S.Ct. 369, 97 L.Ed. 447. As noted there, a trial judge has "wide latitude in control of cross-examination, especially in dealing with collateral evidence as to character." 344 U.S. at p. 423, 73 S.Ct. at p. 375.

■ Next, Battaglia states that he was precluded from showing Riley's purchase price for the Lansing land. It is true that the real estate contract was not admitted by virtue of the best evidence rule. But earlier Battaglia had shown through Robert Biederman's testimony that the price was about $140,000. Since the disparity between the purchase price and the price used in loan negotiations was already in the record, no prejudice stemmed from this ruling.

■ Battaglia complains too that Riley's February 5, 1960, bankruptcy petition should have been admitted. Again, the District Court had broad discretion to refuse it as a collateral matter. United States v. Bender, 218 F.2d 869, 874 (7th Cir. 1955), certiorari denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253. Riley's bankruptcy petition supposedly stated that he owned no stocks or bonds as of that date, but this record does not show that the bankruptcy statement was "obviously perjured" as Battaglia claims.

No abuse of the District Court's discretion has been shown in this exclusionary ruling.

Battaglia complains that in Amabile's cross-examination of Riley, Amabile was not permitted to show that Riley's October 5, 1965, statement to the Federal Bureau of Investigation did not refer to the 1962–1963 threats of Palermo and Amabile. However, Riley testified that he had advised the FBI of these threats and added: "I have only read two pages [of the October 5 statement] and I see it in there, yes, sir." If Battaglia's counsel considered the point worth pursuing, he could have called FBI agents Dahlman and Kotsos to prove the contrary. United States v. Borelli, 336 F.2d 376, 391 (2d Cir. 1964), certiorari denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555.

■ In his reply brief, Battaglia's counsel contends that the Government should have granted his request for production of DiVito's grand jury testimony.[8] No particularized need for this testimony was shown, nor was there any showing that the ends of justice required production. Therefore, production was unnecessary. See Dennis v. United States, 384 U.S. 855, 868–875, 86 S.Ct. 1840, 16 L.Ed.2d 973.

As to Battaglia's principal cases cited to show reversible error, in Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624, defense counsel was not permitted to establish that a prosecution witness was in government custody and therefore might expect consideration. In this case, the defense was permitted to show that both DiVito and Riley were in government custody. In Spaeth v. United States, 232 F.2d 776 (6th Cir. 1956) and United States v. Hogan, 232 F.2d 905 (3rd Cir. 1956), the defense sought to cross-examine government witnesses who stood convicted of a federal offense, in an effort to show that they expected leniency in return for their testimony. The District Court refused to allow such

8. Battaglia's counsel did not request the production of La-Key's and Riley's grand jury testimony.

cross-examination. In this case, Battaglia's counsel subjected DiVito to a lengthy cross-examination about the reasons for the dismissal of the tax evasion indictment against him. This also serves to distinguish United States v. Masino, 275 F.2d 129 (2d Cir. 1960), where such cross-examination of government witnesses was not permitted.

Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447; United States v. Beekman, 155 F.2d 580 (2d Cir. 1946), and Meeks v. United States, 163 F.2d 598, 11 Alaska 378 (9th Cir. 1947) deal with the exclusion of documentary evidence showing that the prosecution witnesses had been punished for violating federal law and were still subject to the jurisdiction of the court or agency which had imposed the punishment. In each case, the information contained in the documentary evidence tended to prove bias and was not otherwise present in the record. In this case, the District Judge remarked at one point: "I assume that the government is the only one who could voluntarily move for the dismissal [of the tax indictment against DiVito.]" This statement, coupled with the extensive cross-examination of DiVito and the examination of the First Assistant United States Attorney in Chicago, told the jury that the indictment had been dismissed on motion of the government. Defendants do not show that any other significant information was contained in the excluded documentary evidence.

Gordon, Masino and Meeks are further distinguishable because in those cases reversal was based on the cumulative prejudicial effect of two or more errors. This case lacks at least one of the errors found in each of those cases.

■ We approve of the foregoing cases and of the policy of affording the defense wide latitude in showing bias. We do not view the disposition of the issues herein as inconsistent with them.

We have considered Battaglia's other points relating to cross-examination, exclusion of documentary exhibits and instructions and find them to be without merit. In closing this discussion, it should be noted that various criticized evidentiary rulings of the District Court were well within those approved in United States v. Lawinski, 195 F.2d 1 (7th Cir. 1952). Taken together, the evidentiary rulings here gave these defendants broader latitude than in *Lawinski* and do not amount to an abuse of discretion.

### Evans' Character Witnesses

■ Evans was precluded from showing his good character through four acquaintances. Relying on Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, the District Court explained that his evidentiary rulings were based on improperly put questions and on improper foundation. As to some of the questions, this may have been an overstrict application of *Michelson*. However, no foundation was laid to show that these witnesses knew any of the people who lived in the community where Evans resided. Proof of reputation "among a limited group such as fellow employees in a particular building" has been held inadmissible. 335 U.S. at p. 481, note 17, 69 S.Ct. at p. 221; Williams v. United States, 168 U.S. 382, 397, 18 S.Ct. 92, 42 L.Ed. 509; Kroot v. United States, 66 F.2d 449, 451 (7th Cir. 1933). Although a more liberal approach to character witness rulings has precedential basis, we adhere to Mr. Justice Jackson's precept not to "disturb rulings of trial courts" in this troublesome field except in rare instances (335 U.S. at p. 480, 69 S.Ct. 213).

### Restriction of Evans' Testimony

Evans argues that the District Court's evidentiary rulings during his testimony denied him an opportunity to present an adequate defense.

It is true that Evans was not permitted to deny certain secrecy admonitions supposedly made about the Lansing project during Riley's June 1964 conversation with Evans, but this was because of the leading and suggestive nature of his trial counsel's questions. To rebut secrecy, Evans' counsel was permitted to elicit that the Riley company had prepared a brochure to promote sales of the Lansing

apartments, and that the Hammond *Times* published a story about the project in August 1964.

The rulings not permitting Evans to answer certain questions as to conversations with Amabile, La-Key, DiVito and Pranno were based on the improper form of the questions and lack of proper foundation. These rulings are supportable under rudimentary rules of evidence. Furthermore, Evans was permitted to deny that he met with those persons after his counsel rephrased his questions.

As to the bid sheets, Evans was allowed to testify that there were a signed original and a signed copy of the sewer contract bid sheets, and that the signed original was left in Riley's office, the very points his trial counsel was attempting to elicit.

Since Evans was charged with a January 1965 conspiracy, we cannot state that it was erroneous for the District Judge to consider irrelevant whether Riley held Evans in high esteem in August 1965.

Our study of Evans' testimony shows that he was given great scope in presenting his denials of any part in the conspiracy. The District Court's exclusionary rulings did not jeopardize his defense and were permissible interpretations of the law of evidence.

*Evans' Counsel's Inability to Comment on Battaglia's and Amabile's Failure to Testify*

Before the defendants presented their witnesses, the District Court instructed their counsel not to refer to the failure of any of the defendants to take the stand. This instruction was of course to protect the Fifth Amendment rights of the two silent defendants, Battaglia and Amabile. The defenses of the three accused were not mutually exclusive. Also, Evans' counsel's closing argument took advantage of Evans' having taken the stand. There was no "showing that real prejudice will result from the defendant's inability to comment" (United States v. Kahn, 381 F.2d 824, 840 (7th Cir. 1967), certiorari denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661, so that severance was not necessitated.

*Trial Publicity*

Even though defendants successfully objected to sequestering the jury, Battaglia now argues that prejudicial publicity violated his due process rights. In closing argument, his counsel recognized that the trial court repeatedly admonished the jury to ignore news coverage. There is no claim that any jurors read any of the "prejudicial" articles, thus differentiating the case from Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. In Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846, the second conviction was reversed because the trial court had not inquired whether the jurors had read a St. Louis *Post-Dispatch* article published during the trial and containing "inadmissible prejudicial information."[9] Here the jurors were twice asked whether they had seen articles about the case. None admitted having done so. United States v. Accardo, 298 F.2d 133 (7th Cir. 1962), and United States v. Largo, 346 F.2d 253, 256 (7th Cir. 1965), certiorari denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157, do not hold that the District Court must always interrogate each juror singly. See United States v. Jannsen, 339 F.2d 916, 919–920 (7th Cir. 1964).

Battaglia also complains of the presence of a permanent press table inside the bar.[10] The Supreme Court has recently emphatically disapproved of such an installation (Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600), so that the District Judges should consider reserving the bar of the court for counsel in the future (384 U.S. at p. 355, 86 S.Ct. 1507). However, we do

---

9. See Solicitor General's Memorandum filed in the Supreme Court in the *Janko* case.

10. Such tables have been installed in the various trial courtrooms in the Northern District of Illinois.

not consider the placement of this press table to constitute reversible error, for this record reveals no "frequent confusion and disruption of the trial" or "constant commotion within the bar" (384 U.S. at p. 355, 86 S.Ct.). In our view, the intrusion of the news media into this trial was not so great as to obviate a showing of prejudice (cf. Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600). Battaglia has failed to satisfy us that he was denied a free trial because of adverse publicity.

*Eavesdropping*

The Government's brief reprints an August 18, 1967, letter from the Assistant Attorney General in charge of the Criminal Division of the Department of Justice to the United States Attorney in Chicago. The letter confirms the Department's pre-trial advice to the United States Attorney that there was no electronic monitoring in this case. Cf. Hoffa v. United States, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738. Accordingly, it is now academic whether the District Court should have granted a hearing to determine whether electronic eavesdropping had taken place.

No prejudicial error having been shown, the two judgments are affirmed.

SWYGERT, Circuit Judge (dissenting).

This dissent is based on two independent grounds. First, I do not believe that the Government introduced evidence sufficient to convict Battaglia and Evans of the crime charged against them. Second, although my views on the sufficiency of the evidence would dictate a reversal without remand, a multitude of prejudicial errors occurred which in combination, if not singly, precluded the defendants from receiving a fair trial. Consequently, on the basis of these trial errors, the case should be remanded for a new trial regardless of the insufficiency of the evidence.

## I.

## SUFFICIENCY OF THE EVIDENCE

Accepting the evidence in the light most favorable to the Government, the evidence unquestionably showed that Amabile, Pranno, DiVito, Evans, and LaKey devised and executed a scheme to defraud the Riley Management Corporation by using the Carlson Construction & Equipment Company as a facade so that moneys meant for construction purposes could be diverted to those participating in the scheme. But this scheme was not the one charged in the indictment. The evidence also unquestionably showed that Amabile threatened Riley for the purpose of obtaining money. The record is barren, however, of any evidence, direct or circumstantial, to sustain the charge that Battaglia and Evans conspired with Amabile "to obstruct, delay and affect commerce" in the movement of materials for the construction of the Riley dwelling units by means of extortion.

In early 1964, the Riley Management Corporation began planning the construction of an apartment building at Lansing, Illinois. In June of that year, William Riley, president of the Riley company, requested his construction superintendent, Dave Evans, to start lining up contractors for the Lansing project, but asked Evans to keep the project "secret from Joe Shine [Amabile] and Nick Palermo." A few days later Riley, at Amabile's request, met Amabile and Palermo at the latter's Melrose Park plumbing company office. Riley testified concerning this meeting:

> Nick Palermo asked me if I was going to build a project in Lansing, Illinois. I told Mr. Palermo that I was and Mr. Palermo asked me when he was going to get the blueprints so that he could figure the work. I told Mr. Palermo that I did not plan on giving him the work. I told Mr. Palermo that he was behind on his existing projects and with the efficiency that we were now enjoying, it was ridiculous to give him this project.

Joe Shine told me that I wasn't going to give it to anyone else other than them and they asked me basically what the hell I was trying to pull, * * *

*  *  *  *  *  *

Joe Shine told me that if I didn't give them the work in Lansing, that he would stop the project in Northlake and in Westmont, Illinois. They told me that I had to use them, that if I didn't use them, that they would put me out of business. I told Nick and Joe that they were now in the process of putting me out of business, the way they were doing it. I was told not to be a smart punk.

Joe Shine told me I shouldn't be a wise guy. Joe Shine told me he knew how to handle wise guys and that I would be walking the streets with a candy cane.

*  *  *  *  *  *

Joe Shine told me he knew where my mother lived. He would—he told me that he knew where my kids went to school and they had a baseball bat to handle wise guys like me.

After this meeting, Riley gave Palermo the plumbing contract for the Lansing project.

In late July or early August 1964, Amabile met Mike DiVito, a sewer contractor, and Rocco Pranno in the latter's D'Or Supper Club in Stone Park, Illinois. Upon learning from Amabile about the Riley project in Lansing, DiVito asked if he could obtain some of the sewer work. Amabile said "it was possible," but that he didn't want DiVito's name on the contract. A few days later Amabile told DiVito and Pranno that if they came up with "a good clean fellow," they could get the sewer contract for the Lansing project. Shortly after this conversation, DiVito and Pranno persuaded Henry LaKey (who had been a foreman on sewer construction jobs) to work for them if they succeeded in getting the Lansing contract.

In mid-September, DiVito, Pranno, Evans, and Amabile met in the latter's apartment in Northlake, Illinois. Pranno told Amabile that he and DiVito "had a fellow to do the work for us called Hank LaKey and that he was clean." Amabile replied, "Okay, that's fine * * * [but] before I give you this job, I want $20,000 in cash."

During this period, DiVito and Pranno hired LaKey to work for them for $200 per week plus a ten per cent bonus upon completion of the job. They told LaKey they were starting a "new corporation" to be called the Carlson Construction & Equipment Corporation and they would like to have him put "on the paper as president" of the company. In contemplation of giving the sewer work to DiVito and Pranno, Evans apparently drafted a written contract to be signed by Carlson Construction. The contract that Evans originally drew up, however, was unsatisfactory to DiVito and Pranno because they had decided, after looking over the plans, that there would be insufficient proceeds from the job to pay Amabile the twenty-thousand dollars he had demanded "off the top." At this point, Amabile told Evans to figure a way to get more money out of the job. Evans rewrote the contract raising the price approximately forty to forty-five thousand dollars. After looking at the plans and specifications and seeing the high price of the job pursuant to the rewritten contract, DiVito informed Pranno that "there would be $20,000 in cash above our costs and profits." Pranno then told Amabile in the presence of DiVito and Evans that he would give him the twenty thousand dollars. Amabile replied "Okay, it's a deal." In accordance with their previous discussion, Pranno, DiVito, and LaKey formed the Carlson Construction & Equipment Company. DiVito and Pranno each received forty-five per cent of the stock and LaKey the remaining ten per cent.

Sometime in September, Riley asked Evans whether he had lined up a sewer contractor. Evans said that he had obtained an excellent contractor, Carlson Construction, operated by a man named LaKey. Evans told Riley that he "had looked into Carlson Construction's repu-

tation, it was excellent, and * * * [he] felt quite confident that this man could do a good job." Carlson Construction was given the contract under an arrangement whereby Lawn Savings & Loan Association was to pay Carlson upon receipt of payment slips issued by the Riley company. Carlson Construction commenced the sewer work in September or October, 1964.

Early in November, Amabile instructed LaKey to get the necessary papers ready for making the first "draw." After preparing the papers, LaKey went to see Amabile at the El Morocco, a night club operated by Amabile in Northlake, Illinois. LaKey testified: "Joe Shine [Amabile] asked me how much the draw was for. I told him $57,000. * * * Joe Shine said he would get a hold of Dave Evans and straighten this out." Within a day or two, LaKey and Amabile went to see Evans, who was a patient in Illinois Masonic Hospital. Before they saw Evans, Amabile told LaKey that Evans was going to receive $5,000 as his cut, not $7,500 as originally planned. At the meeting, Amabile gave Evans a "wad of bills." Evans then looked over the papers for the first draw and crossed out a number of items. After the papers had been retyped, reflecting a reduction of $10,000 in the draw, Evans approved the papers and told LaKey to take them to Riley's office. On November 12, LaKey received a check for $47,517.97 from Lawn Savings & Loan Association based on a pay-out slip approved by Sol Meltzer, Riley's comptroller. LaKey deposited $39,000 in the Carlson Construction payroll account. Of the remaining $8,517, LaKey retained $517 and gave Pranno $8,000. Three days later, at Amabile's direction, LaKey withdrew $20,000 in cash from the Carlson Construction account which he gave to Amabile.

In January 1965, Amabile told LaKey to prepare the papers for a second draw. LaKey got the papers ready and showed them to Amabile who asked how much the draw was for. LaKey replied, "$60,-000." Amabile thought that this figure was too high, saying, "I don't want that kind of money taken out of the account at this time. * * * I will tell you what to draw." He also said that he would straighten it out with Evans. That same day, Evans reduced the figure to $48,000 and, after approving the papers, told LaKey to present them to Meltzer for the payment slip. When LaKey presented the papers covering the second draw for approval, Meltzer refused to authorize the request.

LaKey immediately went to see Amabile, relating in Evans' presence what had happened. At Amabile's instruction, Evans and LaKey went to see Riley the next day. Pursuant to Evans' request, however, they entered the office separately. When LaKey told Riley that he was there to get the second draw, Riley replied that Carlson Construction's bills were not being paid, and that he would authorize a payment only when LaKey had satisfied these obligations. During the conversation, LaKey told Riley that the cost of the job had gone up from $120,000 to $200,000. When Riley asked Evans to explain why the price had been increased, Evans told Riley, "There's complications set in on the job and we had to raise the price up to get the job done."

LaKey reported to Amabile that Riley had refused to authorize the second draw. Amabile replied: "You be here tomorrow morning. I'll personally go with you to the office myself. I'll get this straightened out once and for all." The next morning LaKey and Amabile arrived at Riley's office and walked in unannounced. Amabile asked Riley why he did not pay LaKey. Riley said he couldn't authorize the draw until LaKey had paid his bills. Amabile then told Riley: "I don't care nothing about that. The man's got his money coming, Bill, I want you to pay his money." At that point, Amabile and Riley went to the back of the office and commenced a conversation during which LaKey "seen a lot of arms moving by Joe Shine," who was doing most of the talking. Then Amabile walked towards LaKey, gave him a wink, laughed, and said, "You'll get your money

now." Before leaving, Amabile turned to Riley and said: "Don't forget, Bill, I want you to pay this man. I want you to pay him now. You know what I mean." On the way back to the El Morocco, La-Key asked Amabile how he was able to tell "a big man like Riley" what to do. Amabile put up his fist and said, "I got this son of a bitch right here, * * * He's afraid of me."

On the witness stand, Riley gave this version of the meeting:

> Mr. Shine told me that I had to pay this man, that this man was a friend of theirs; that I was expected to pay them; that if I didn't pay them all sorts of people would get mad.

> I told Joe that it would be foolish for me to make this payment; that they were just pushing this company to ruination; that it just was absolutely ridiculous to pay this man and that I did not want to pay him.

> \* \* \* \* \* \*

> Mr. Shine told me that I had no choice on this matter; that I had to pay this man; that the man wanted him. paid.

> I told him that this was silly. I had a big loan pending with Equitable Life and this thing would, it could destroy everything that we were trying to build up. I told him that, in fact I begged him not to have to pay him. He told me that I had to pay him.

> \* \* \* \* \* \*

> He told me the man said I had to pay him and he told me if I didn't pay him there would be all sorts of trouble, and there was no sense in me making this trouble for myself so I better pay him because he was a friend of theirs.

Riley further testified that he subsequently authorized the payment because he was afraid; that he had been subjected to previous threats of physical harm to his family and his employees and ruination of his company by Amabile and Nick Palermo. Shortly after this meeting, LaKey deposited a $48,512.48 check, received from Meltzer, in the Carlson Construction bank account. Later Amabile told LaKey to withdraw $17,000 from the account. Of this amount, Amabile gave LaKey $5,000; LaKey in turn gave Evans $1,000.

A close analysis of the evidence in this case is essential to determine whether the Government proved the crime charged. The precise charge was a conspiracy to extort money from Riley. The gist of the crime of conspiracy is an agreement between two or more people, rather than the resultant action undertaken pursuant to the agreement. Since the agreement is the gist of the crime, the agreement itself must be proved either by direct or circumstantial evidence. If circumstantial, the circumstances must be such as to warrant the jury in finding that the alleged conspirators had "some unity of purpose, some common design and undertaking, some meeting of minds in an unlawful arrangement * * *." Shannabarger v. United States, 99 F.2d 957, 961 (8th Cir. 1938).

The conspiracy charged in this case was allegedly aimed at obstructing and delaying the interstate movement of materials and supplies required for Riley's Lansing project. That obstruction and delay was to result from the extortion of $48,500 from the Riley Management Corporation by engendering fear of bodily and economic injury in William Riley.

There is a substantial question concerning the admissibility of many statements testified to by DiVito, LaKey, and Riley, which were neither relevant to the crime charged nor binding on absent alleged coconspirators. Assuming for the sake of argument, however, that all their testimony was relevant and admissible, I still do not believe that the evidence shows either that Evans agreed with Amabile and Pranno or that Battaglia agreed with Amabile and Pranno to commit the extortion charged in the indictment.[2]

---

2. There was no proof that Evans and Battaglia had any connection with each other except through common acquaintance with Amabile, DiVito, Pranno, and LaKey.

The evidence with regard to Evans shows that the only agreement or "common design and undertaking" to which he was party was one to bilk the Riley company by means of fraud and deceit out of money earmarked for the Lansing job. Consistent with a scheme to defraud, DiVito and Pranno kept in the background, Amabile expressly ordering DiVito to stay off the job. A "good, clean fellow," LaKey, was recruited to act through the facade of Carlson Construction. There was constant effort among the conspirators to make sure that Riley was kept in the dark about Amabile's connection with Carlson Construction. Both draws were misrepresented to Riley as being legitimate expenditures. All these facts, as well as many others in the record, are indicia of fraud rather than extortion. Fraud is marked by misrepresentation, deception, and deceit. Extortion is direct and brutal—the very antithesis of fraud.

The Government argues that the most conclusive direct evidence showing Evans to be a "willing participant" in the conspiracy is a statement made by him to LaKey when LaKey expressed anxiety about paying his bills. Evans said: "I will talk to Joe Shine and Joe Shine will talk to the man. * * * We will see that the money is in the bank for you." (This statement was made in January 1965, after the first draw and after Amabile had gotten his $20,000 "off the top.") Subsequent to Evans' statement, arrangements were undertaken for the second draw. Again attempts were made to deceive Riley. Evans decreased the amount of the draw prepared by LaKey. When LaKey failed to get the draw approved, Evans accompanied LaKey to Riley's office, but by prearrangement they entered the office separately. Evans told Riley on this occasion "there's complications set in on the job and we had to raise the price up to get the job done."

The foregoing facts, all involving conduct by Evans occurring after his statement relied on so heavily by the Government, suggest only deceptive conduct on his part, rather than complicity in a scheme to extort. Moreover, these same facts highlight the individual action of Amabile in resorting to extortion. When Amabile realized that the subterfuge was no longer working as it had in the past, he decided to take things in his own hands, and, unknown to the others, unmask the fraud and threaten Riley in order to get an approval of the second draw.[3]

The Government also argues that the creation of Carlson Construction merely "put a velvet glove on the iron fist with which Amabile and 'The Man' had terrorized Riley in the past." Although past extortion of Riley had been used to obtain contracts, the Government contends that in the present situation, Amabile, with Evans' cooperation, did not have to resort to force to obtain the sewer contract; instead Amabile could wait and exert his pressure to obtain the money obligated by the contract.

In fact, however, this argument reveals the clear import of the evidence in this case—that a fraudulent scheme was practiced on Riley. When Riley flatly refused to approve the second draw even though Evans had tried to persuade him in the other direction by making a bald misrepresentation, Amabile unilaterally, and perhaps spontaneously, reverted to his

---

**3.** This use of the phrase "the man," like some of its other uses, (See infra notes 5–7 and accompanying text) fails to identify the person being referred to. The majority recognizes that in this instance the phrase could refer to either Battaglia or Riley. Yet they conclude by implication that Evans was referring to Riley, stating, "The jury could properly infer that Evans knew Amabile would induce Riley—through fear—to authorize the second draw." If he was instead referring to Battaglia, the most damaging aspect of the Government's case against Evans is neutralized. Because the phrase "the man" is so indefinite and ambiguous, only speculation and surmise could supply the purport of a reference to Battaglia. But the same speculation and surmise is necessary to support the majority's rationale that the statement reflected Evans' awareness that Amabile was going to exercise extortion on Riley.

more accustomed role, that of an extortionist. This unilateral action on the part of Amabile cannot be transformed into a prior agreement with Evans and Battaglia to extort as the Government charged in the indictment.[4]

The slender reed on which the Government depends to demonstrate an agreement to extort between Amabile and Evans is not even present with respect to Battaglia. The evidence touching upon Battaglia's connection with the crime charged may be summarized as follows. Riley testified that although he had never met Battaglia, he had seen him once in early 1964 in Amabile's night club. DiVito testified that he saw Battaglia talk to Amabile in October of that year in Amabile's club. LaKey testified that in late November or early December, he was with Amabile at Battaglia's farm in Pingree Grove, Illinois, where he was introduced as "Hank LaKey running the job for them in Lansing, Illinois." While there, he heard Battaglia ask Amabile why Evans was "getting that kind of money." Amabile replied: "I made a deal with the man. The man got us the job. * * * I promised him $7,500, I'll take care of it." DiVito testified that in February or March 1965, he went with Pranno to Battaglia's farm. Amabile came a few minutes later and the three of them awaited Battaglia's arrival. According to DiVito, Pranno said in Amabile's and Battaglia's presence, "You know about this Riley deal in Lansing where we got Hank LaKey to set up the company and do the work for us and figure $20,000 in for you?" Battaglia nodded. Pranno and Amabile then argued whether Amabile had taken LaKey away from Pranno. Battaglia interceded by saying: "Cut it out, you fellows. Keep it down." DiVito further testified:

> Then Jim Pranno continued to talk and he says, "You know we had to borrow $5,000 to keep this job in Lansing going and now I can't find LaKey, and you know there was $20,000 in this deal for you." Mr. Battaglia nodded, says "Yes." And then Jim Pranno continued and says, "I want to know what Joe Shine is doing to me. I want you to tell Joe Shine to get that $5,000 from LaKey so that we can pay back this loan," and Jim Pranno continued on to say that Hank LaKey was a no good s.o.b. Then Mr. Battaglia says, "Well, I don't think Hank LaKey is such a bad guy, I like him, I like to work with him," that they had other things coming up, and that they could use him again because he was clean. And after a minute or so, a pause of about a minute, then Mr. Battaglia got up out of his chair and said, "Rocky, I'll see what I can do for you."

On this record there is absent any evidence, direct or circumstantial, demonstrating that Battaglia knew that money was to be extorted from Riley or that threats were to be made to Riley by Amabile. Nor is there any evidence that

---

4. The record indicates that prior to the second draw Evans told LaKey that the only contracts Evans would "let out here [Lansing] are the ones Joe Shine tells me." Evans' deep involvement with Amabile is further indicated by a statement Evans made to LaKey after the second draw when he said: "I can't get out. I am too deep with Joe Shine. I know too much about the other people." The day before this conversation, LaKey had been called back from Florida to a meeting attended by Amabile and Evans. LaKey described what took place:

> I got in a conversation with Joe Shine first as soon as I got in the Club, he hollered and told me, he said, "You're not paying the bills, you're not taking care of the job. You got me in trouble with Riley. Riley's in trouble. You're making Dave Evans lose his job. You're taking my man right out of Riley's. I don't know what is going on. You are causing nothing but trouble."

In sum, although this testimony confirms Evans' association with Amabile, it just as strongly suggests that their association was in furtherance of a scheme to defraud. At the time of the meeting testified to by LaKey, Evans was unaware that Amabile had committed extortion upon Riley to obtain the second draw. The only inference that can properly be drawn from LaKey's testimony, therefore, was that Amabile was attempting to keep the ruse going by conveying the impression to Evans that the scheme to defraud was still in operation.

Riley feared Battaglia or that Battaglia received any of the money extorted from Riley. Finally, there is no evidence that Battaglia agreed with Amabile, Pranno, or Evans to commit the crime charged against them. Yet the Government argues in its brief:

Just as Evans acted at Amabile's direction, Amabile worked at the direction of the defendant Battaglia. Amabile was the muscle while Battaglia was the brains, setting policy and settling disputes. His veil of secrecy was his supposed anonymity, known to a few as "The Man." When one wanted to see "The Man," one went to "The Farm."

From the foregoing evidence a jury could infer that Battaglia had a real interest in the outcome of the Lansing project, that he was participating financially in Carlson Construction's contract and that all other co-conspirators acted at his direction, directly as with Amabile, or indirectly, as with Evans.

From his own mouth Battaglia admitted knowledge of Evans' role and that Evans was being paid. Battaglia knew of LaKey's role and that Carlson Construction had the contract on the Lansing project. He knew that LaKey was being used as a front, because "he was clean." With Battaglia's knowledge of the foregoing, the jury could conclude that he was a participant in the conspiracy to place Riley in such a position that when Riley learned that Carlson Construction was in fact Amabile and Battaglia, he would authorize payment of the money in the escrow account, not because of the contract, but because he feared Amabile and "The Man."

These inferences which the Government seeks to draw, some of them non sequiturs, can rise no higher than speculation and surmise.

Much of the Government's case against Battaglia rests on identifying him as "The Man." But of the numerous instances of the use of that phrase in the record, many refer not to Battaglia, but rather to LaKey,[5] Evans,[6] and Amabile.[7] Battaglia's financial stake in the alleged conspiracy to extort is demonstrated, according to the Government, by his two nods and saying "Yes" at the mention of "$20,000 in for you." Although Battaglia's responses to the mention of the money indicate that he was not a stranger to the Lansing venture, they are in no way probative of his complicity in a conspiracy to extort. The force of the Government's argument in this regard is largely diminished by the fact that "the Brains" [Battaglia], who was supposedly "setting policy," had to be reminded twice by Pranno that he had money coming to him.

Reliance is placed by the majority on two Second Circuit cases, United States v. Andolschek, 142 F.2d 503 (2d Cir. 1944), and United States v. Falcone, 109 F.2d 579 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). *Andolschek* is cited in support of the proposition that "Battaglia had 'embarked on a criminal venture of indefinite outline'" and therefore, "had to 'take his chances' as to the methods used by the other co-conspirators." The full text of the passage, however, is more illuminating:

It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances

---

5. When Amabile went to see Riley concerning the second draw, Amabile said, *"The man's* got his money coming, Bill, I want you to pay his money." (Emphasis added.)

6. When LaKey and Amabile were going to visit Evans in the hospital, LaKey said, "Joe, the deal was for $7,500 for *the man."* (Emphasis added.)

7. When Riley first met Amabile and Palermo in April 1962, Riley testified, "Mr. Shine who I had just met struck his face in my face and told me he was *the man* in Northlake." (Emphasis added.)

as to its content and membership, so be it that they fall within the common purposes as he understands them. *Nevertheless, he must be aware of those purposes, must accept them and their implications, if he is to be charged with what others may do in execution of them.* United States v. Andolschek, supra, 142 F.2d at 507. (Emphasis added.)

And despite the majority's assertion that the "stringent test of conspiracy liability" set forth in *Falcone* was met by the Government here, that case condemned guilt by mere association.

There are indeed instances of criminal liability of the same kind, where the law imposes punishment merely because the accused did not forbear to do that from which the wrong was likely to follow; but in prosecutions for conspiracy or abetting, his attitude towards the forbidden undertaking must be more positive. It is not enough that he does not forego a normally lawful activity, of the fruits of which he knows that others will make an unlawful use; he must in some sense promote their venture himself, make it his own, have a stake in its outcome. The distinction is especially important today when so many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders. United States v. Falcone, supra, 109 F.2d at 581.

There can be no doubt that Amabile and Battaglia associated together, but, as the court stated in *Falcone,* a mere association is insufficient evidence of guilt to support a conviction.

## II.

### TRIAL ERRORS

In urging reversal, Battaglia and Evans point to a number of trial errors which they claim not only unduly prejudiced them, but also prevented them from receiving a fair trial. Contrary to the majority's disposition of these contentions, I believe that such errors did occur.

Because of my views on the sufficiency of the evidence, however, I do not believe that an extended discussion of the trial errors is either necessary or appropriate. I only refer to them as they reflect upon the conduct of this trial as a whole, the most striking aspect of which was the unfavorable climate in which the proceedings were conducted. Perhaps no single error occurring outside that climate would be sufficient to require a reversal; however, their cumulative effect, as exemplified by the three errors that will be discussed in detail, leads inevitably to the conclusion that the defendants were denied a fair trial.

### A. *Pre-conspiracy Threats*

The indictment charged that a conspiracy among the defendants to violate the Hobbs Act began "in or about July, 1964." Yet, William Riley, the victim of the alleged extortion, was permitted to testify over objection about threats made to him in 1962 and 1963 by defendants Amabile and Nick Palermo. These threats related to Riley's proposed building project in Northlake, Illinois and the subsequent payment of $30,000 to Amabile. Riley also testified about threats made by Amabile and Palermo in 1963 in regard to plumbing work at a Riley building project in Westmont, Illinois. Palermo on that occasion said he "would bury Hubley," Riley's construction superintendent, and Amabile said he "would hammer the nails on the coffin." Amabile made other threats to Riley at that time. Purportedly, this testimony was admitted for the purpose of showing the basis of Riley's fear of Amabile in January, 1965. There was ample testimony by Riley, however, of threats made by Amabile after the commencement date of the alleged conspiracy.

According to the majority, the testimony of these threats was "relevant to show the reasonableness of Riley's fear when confronted with Amabile's demand to authorize the second draw. The District Court carefully instructed the jury that this testimony was limited to that purpose." Although I agree that proof of the reasonableness of an extortion

victim's fear by testimony of prior threats is generally permissible, the testimony of threats made by Palermo, who was not even charged as an unindicted coconspirator, was irrelevant for any purpose. Moreover, I am at a loss to find the "careful instruction" referred to by the majority. Because the testimony of threats by Palermo was both irrelevent and inflammatory, the defendants were prejudiced by the district court's failure to instruct the jury to disregard that testimony. Cf. United States v. Critchley, 353 F.2d 358 (3rd Cir. 1965).

## B. The Accomplice Instruction

The accomplice instruction was improper because the district judge, in his definition of an accomplice, for all practical purposes told the jury that the crime charged had in fact been committed. In so doing, he invaded the province of the jury. This kind of an instruction would be proper in a prosecution where the alleged accomplice admitted his participation in a conceded criminal offense. In that situation, an instruction like the one given here correctly delineates the weight to be accorded the testimony of the accomplice as that testimony tends to implicate others in the crime that has been committed. In the instant case, however, the crucial question was not who the participants of a conceded crime were, but whether a conspiracy to violate the Hobbs Act, the crime charged, had been formed by the alleged conspirators.

Because the instruction did not explicitly leave open the question whether any of the witnesses were accomplices, the jury may reasonably have interpreted the instruction as a direction from the judge that the crime charged had been proved. To avoid this substantial risk of prejudice, the instruction should have been framed so that the jurors were unequivocally informed that they were the sole judges of whether any witness was in fact an accomplice. Such modification would have cured the instruction's vice—the implied assumption that the

alleged conspiracy was a proven fact. See Gordon v. United States, 353 F.2d 9 (5th Cir. 1965).

## C. Evans' Character Witnesses

Evans sought to elicit testimony of his good character through four witnesses. Conceding the somewhat inept manner in which this undertaking was attempted by Evans' counsel, the district judge's treatment of these efforts was nevertheless unduly restrictive. Throughout the course of defense counsel's efforts to question the character witnesses, Government counsel interposed objections to all questions directed to an assessment of Evans' general reputation as an honest, truthful, and law-abiding citizen. On almost every occasion, these objections were indiscriminately advanced by the simple statement, "I object." With equal regularity, the judge sustained the objections, only rarely intimating the reasons for this action.

At one point, Evans' counsel obviously frustrated and bewildered, asked the judge to elaborate on his prior statement that "the question is improperly put." In response, the judge should have either demanded that Government counsel frame his objections in more concrete and specific terms or sustained the objections in a manner to convey to defense counsel the reason for his rulings. His failure to do so worked an unnecessary and prejudicial hardship on Evans' counsel's efforts to elicit character testimony from his witnesses.

In addition, some of the court's rulings sustaining the Government's objections were erroneous. On more than one occasion, a foundation was laid to qualify the witness, and the question posed to the witness was properly phrased. The apparent basis for the rulings sustaining the Government's objections to these particular questions was that the testimony sought related to Evans' reputation in the business community rather than his reputation in the community where he lived. The majority relied on this distinction, stating, "[N]o foundation was laid to show that these witnesses knew

any of the people who lived in the community where Evans resided."

Reputation in the business community, however, is no less probative than reputation in the residential community to show the absence or presence of certain character traits in an accused. In this regard, Professor McCormick's observation is apposite:

> The reputation is usually said to be limited to that which obtained in the community where the accused lived, but this should be extended to embrace any considerable group with whom he constantly associated in his business, work, or other continued activity, and who might reasonably be thought to have a collective opinion about him. C. McCormick, Handbook of the Law of Evidence § 158, at 335 (1954).

See also Whiting v. United States, 296 F.2d 512, 517 (1st Cir. 1961). Because the crime charged against Evans had a business setting, the most probative character evidence was kept from the jury by the court's rulings. These rulings were erroneous. They were also prejudicial. For as the Supreme Court said in Michelson v. United States, 335 U.S. 469, 476, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948), "This privilege [of presenting character testimony] is sometimes valuable to a defendant for * * * such testimony alone, * * * may be enough to raise a reasonable doubt of guilt * * *."

### III.

Instead of the traditional presumption of innocence with which criminal defendants are ordinarily clothed, the record in this case suggests that a presumption of criminality attached to the acts of these defendants because of their infamous reputations and notoriety. The defendants may have been guilty of nefarious conduct for which they deserve imprisonment, or they may have had such bad reputations as to be considered menaces to society. Such facts alone, however, cannot warrant a blinding of eyes, permitting a conviction to stand that is based on surmise rather than evidence. This kind of difficulty is present in this case because the charge on which the defendants were convicted and imprisoned, an agreement to extort money, was not sustained by the evidence. No person should be punished under our criminal laws unless he has been proved guilty of a specific offense by competent evidence in a fair trial. Due process of law demands nothing less.