UNITED STATES of America,
Plaintiff-Appellee,

v.

Cleophus C. LEWIN, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas F. CONNON and John Janow,
Defendants-Appellants.

Nos. 18662, 18760.

United States Court of Appeals,
Seventh Circuit.

Argued March 2, 1972.

Decided Aug. 23, 1972.

Rehearing Denied Nov. 8, 1972.

Lawrence S. Galka, George F. Callaghan, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., John B. Simon, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Asst. U. S. Atty., of counsel.

Before PELL and SPRECHER, Circuit Judges, and DILLIN,* District Judge.

PELL, Circuit Judge.

Appellants Thomas F. Connon, John Janow and Cleophus C. Lewin[1] were convicted by a jury of conspiracy in violation of 18 U.S.C. § 371 to pay and offer to pay persons for registering to vote in violation of 42 U.S.C. § 1973i(c).[2] After denying defense motions for judgment of acquittal notwithstanding the verdict, in arrest of judgment, for a new trial, and for a presentence investigation, the district court sentenced Connon and Janow to two years in custody, together with fines of $2500 and costs against each, and Lewin to one year in custody.

On this appeal, Connon, Janow and Lewin raise some ten points for our consideration, including the unconstitutionality of the statute under which they were convicted, the inadequacy of the voir dire, and procedural errors occurring during trial.

October 7, 1968, was an official registration day for persons desiring to vote in the City of Chicago. For the residents of the 47th Precinct of the 27th Ward in Chicago, the official place of registration was the Legion Hotel.

Midmorning of that day, Chicago Daily News reporter Donald Barlett entered the lobby of the Legion Hotel and took a seat near a table behind which sat defendants Connon and Janow, a James Davis and an unidentified male. Barlett saw a man, subsequently identified as defendant Lewin, come to the table with

---

* District Judge S. Hugh Dillin of the Southern District of Indiana is sitting by designation.

1. Case No. 18760 concerns defendants Connon and Janow; No. 18662 concerns their co-defendant, Cleophus Lewin.

2. 42 U.S.C. § 1973i(c) provides:
 "Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives. . . ."

18 U.S.C. § 371 provides in part:
 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The conspiracy count was Count IV of the indictment. Counts I, II and III charged Connon with the substantive offenses of paying persons to register. Because the Government introduced no evidence in support of those allegations, the trial court granted Connon's motion for acquittal as to these three counts at the close of the Government's case.

another man. Defendant Connon then wrote something on a yellow piece of paper and gave it to the man with Lewin who wrote on it. Connon then handed Lewin a one-dollar bill. When Lewin and the man accompanying him left the lobby, Barlett followed them and observed Lewin hand two quarters to his companion.

Barlett returned to his same seat in the hotel lobby and soon thereafter saw several similar transactions. He left the hotel, returning at 1:30 p.m.

At that time, William Recktenwald, an investigator for the Better Government Association (BGA), also took a seat from which he could observe the men at the registration table. Shortly thereafter, Barlett and Recktenwald observed three incidents, each consisting of a man approaching the table, writing on a yellow form, and receiving a one-dollar bill from defendant Connon.

In midafternoon, Barlett and Recktenwald saw defendant Lewin enter the lobby with two men who went to the table and wrote something on yellow papers. They observed Connon hand Lewin two one-dollar bills. When Lewin and the two men left the hotel, Recktenwald followed them. He saw Lewin give each of the men two quarters and overheard him tell them, "See, I take care of you. I got you money for registering."

Recktenwald then followed Lewin to a Madison Street hotel, from which Lewin emerged accompanied by an unidentified male. Lewin and the man went to the Legion Hotel lobby, where both Recktenwald and Barlett saw Connon hand Lewin a one-dollar bill. Outside the hotel, Recktenwald watched Lewin give the man two quarters.

In the early evening of October 7, when both Recktenwald and Barlett had resumed their stations in the lobby of the Legion Hotel, they observed a man approach the table at which Connon and Janow sat, write on a yellow form and receive one dollar from Connon. The same sequence occurred when two other men came up to the table. After these men left, another man approached the registration table and wrote something. Connon then reached in his pocket and stated he was out of singles. He looked at defendant Janow, who put his hand in his pocket and said, "So am I" or "I don't have any." Janow then turned to Davis, who took a dollar bill from his pocket and handed it to Janow, who passed it to defendant Connon, who, in turn, gave the bill to the man who had just written on the yellow form. Connon then went to the hotel desk clerk, handed him a bill and received several bills in return.

At about 6:30 p.m., Barlett and Recktenwald saw Lewin with another man walk up to the registration table and talk to Connon. After the man wrote on the yellow card and as Connon started to hand him a bill, Lewin said, "Wait a minute, man. I gets the money for registering these people." Lewin took the dollar from Connon and gave two coins to the other man. Connon then told Lewin, "Don't bring any more in. Get out of here."

The events to which prosecution witnesses Recktenwald and Barlett testified were corroborated in part by witness Quitman Dillard, an unindicted co-conspirator who had observed and talked with Lewin (whom he knew as "James Dean") several times during the day in question.

Over defense counsel's objections, Recktenwald and Barlett testified as to the results of subsequent investigations they made. These investigations revealed that defendants Connon and Janow were not the official registrars for the 47th Precinct. Recktenwald and Barlett were also allowed to testify to a meeting they had with Connon and Janow on October 14, 1968, at which meeting Connon admitted that he had been "in and out" of the Legion Hotel on registration day.

All three appellants contest the constitutionality of 42 U.S.C. § 1973i(c). Lewin maintains that it is so vague and indefinite as to be violative of due proc-

ess, and Connon and Janow argue that the offense pleaded in the indictment is not made such by the statute involved.

More specifically, Lewin avers that civic-minded individuals or groups who encourage voter registration by, for example, providing transportation would be in literal violation of the statute, as would employers who continued wages during time off for the employee to register. Although conceding that the legislative debate about the provision clearly revealed that Congress' intent was not to make criminals of civic-minded persons, he argues that the statute itself fails to make any distinction between "laudatory acts" and "criminal acts."

■ We are unpersuaded that the statute is unconstitutionally vague or proscribes efforts by civic groups or employers to encourage people to register. The statute uses the word "pay." It in no way prohibits *assistance* rendered by civic groups to prospective voters; nor would we deem a fringe benefit continuance of an employee's wages to be proscribed by the statutory direct prohibition against payment *for* registration.

■ Connon's and Janow's contention that the statute applies only to the actual registrant is belied by the disjunctive wording of the statute. 42 U.S.C. § 1973i(c) provides that "Whoever . . . pays or offers to pay or accepts payment either for registration to vote or for voting" shall be guilty of an offense. Thus, the statute refers to two groups of persons: (1) those who pay or offer to pay for a person's registering to vote or voting; and (2) those who accept payment for doing so. As the Government points out, "[i]t is anomalous to reason that Congress intended to only prohibit persons of lower economic reaches of society from paying for a right which they already possess." Further, the defendants' strained construction of the provision contradicts the law makers' intentions as reflected in the remarks of the statute's sponsor.

In sum, we find that the provision survives these attacks and that the trial court correctly denied the defendants' motions to dismiss the indictment.

■ As an additional attack upon the indictment, it is asserted that the registration was for all elections in Illinois and that the indictment was not restricted to elections for the specified federal officials. The wording of the indictment as material was "by offering to pay and by paying persons for registering . . . to vote at elections in the State of Illinois, including . . . elections held for the purpose of selecting or electing candidates for the office of President, Vice President, presidential elector, member of the United States Senate, or member of the United States House of Representatives."

The Illinois statute [3] provides for permanent registration and, of course, registration carries with it the privilege of voting in non-federal elections. We find no merit in the contention.

Defendants-appellants Connon and Janow also contend that the district court abused its discretion and committed reversible error in failing to ask certain questions of the veniremen.

Although the trial court used few of the 29 questions suggested by the defense, the defendants consider two of the rejected inquiries to be particularly significant. They concerned the prospective jurors' contributions to or employment by either the Better Government Association or the Chicago Daily News.[4] As is apparent from our de-

---

3. Ill.Rev.Stats. ch. 46, § 6–49.1 (1967).

4. Question 13 (which really was a suggested topic rather than a question proper) provided: "Contribute to any political party or candidate, or contribute to any civic organizations, such as (a) Better Government Association; (b) Independent Voters' League; (c) Chicago Crime Commission." Question 27 was: "Have you or any member of your family or any friend or acquaintance ever been

scription of the evidence, the Government's case rested heavily—indeed, almost exclusively—on the testimony of the paid investigator for the BGA, Recktenwald, and that of the reporter for the Daily News, Barlett. In his opening statement, Government counsel acknowledged the importance to the prosecution of the two organizations when he said, "The evidence . . . will show that the inception of this case, and you will hear testimony from people from both of these agencies, was upon the investigation by a representative of the Chicago Daily News and the Better Government Association."

While trial lawyers devote much cogitation and intraprofessional discussion to the matter of selecting a proper jury—propriety presumably being equated with fairness and disinterestedness—nevertheless, because of the uncertainty of human reactions to often unknown or unanticipated motivating factors, the entire voir dire procedure is fraught with precariousness as to whether the desired resultant jury will be realized. Character qualities derivable from interrogation are often elusive and the answers to questions may frequently be illusory as a firm basis for any type of challenge.

Prejudice and bias are deep running streams more often than not concealed by the calm surface stemming from an awareness of societal distaste for their existence. Extended and trial-delaying interrogation may not pierce the veil, yet a few specific associational questions as a maieutic process may indicate the dormant seeds of prejudice, preconceived and unalterable concepts or other non-fairness disqualifications. The result may not reach the stage of being a basis for cause challenge but could well, because of an abundance of counsel caution, bring about a peremptory challenge which an omniscient eye would have known should have been exercised.

We are told that the British courts quickly secure their juries, and criticism is directed at time-consuming trials within trials in this country when prospective members of the jury may wonder, as their lives are being probed, who is being tried. We think the criticism of too extended voir dire is justified but we are not ready to say that the person who has his liberty or, indeed, his property, at stake must be compelled to accept a jury on a strictly cursory, generality interrogation basis.

At some happy mesne point, there must be permitted sufficient questioning to produce, in the light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge.

Rule 24(a), Fed.R.Crim.P., provides as follows:

"(a) *Examination.* The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to

employed by: (a) Better Government Association; (b) The Chicago Daily News, or any other newspaper?"

Before the defendants exercised their peremptory challenges, the following exchange occurred:

"Mr. Callaghan: Would your Honor ask the jurors whether any of them have ever been employed by the Better Government Association or the Chicago Daily News?

"The Court: I think not. I have never approved of that kind of question. I will instruct them more forcefully when the time comes. I know you

have it on your list. I don't approve of that type of question. I never ask it. I refuse it.

 * * * * *

"Mr. Callaghan: I suggest to your Honor that any juror who may have been contributing to the BGA and such organizations might not be a fair juror where defendants are concerned, and that is why I ask that the question be asked.

"The Court: I don't want to argue that question with you, but I do not agree with you. . . . I shall not ask that question at this time."

the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

■ We do not deem "as it deems proper" to give a trial judge unlimited discretion to ignore proposed questions nor to permit arbitrary refusal to put such questions.

■ We do not consider the court's obligation to let counsel, on request, get at underlying bases reflecting on bias, prejudice or other suspect factors to be discharged by general questions such as, "Is there any reason you cannot fairly and impartially try this case?" This obligation particularly would not seem to be discharged by general direct confrontation questions on human characteristics that most people are reluctant to admit they possess.

On the other hand, we do not mean to suggest that the same matter may be explored in numerous substantially similar questions, with tedious repetitions, of only slightly variant shadings of meaning. No hard and fast rules can be laid down, but the trial court within the general guidelines hereinbefore set forth must exercise its discretion so as not to block the reasonable exploration of germane factors that might expose a basis for challenge, whether for cause or peremptory.

■ We agree with the defendants that, under the circumstances of this case, their requested line of inquiry was appropriate and should have been permitted. Their right to be tried by an impartial jury included the right to an examination designed to ascertain possible prejudices of the veniremen about the organizations employing the anticipated chief witnesses, where the testimony stemmed from work done by the witnesses on behalf of those organizations. Cook v. United States, 379 F.2d 966, 971–972 (5th Cir. 1967). *Cf.* Brown v. United States, 119 U.S.App.D. C. 203, 338 F.2d 543, 545 (1964) (opinion by then Circuit Judge Burger); Chavez v. United States, 258 F.2d 816, 819 (10th Cir. 1958), cert. denied sub nom. Tenorio v. United States, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1959). *See generally* Swain v. Alabama, 380 U. S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); United States v. Napoleone, 349 F.2d 350, 353 (3d Cir. 1965); American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury § 2.4 (Approved Draft, 1968).

We are not implying that the existence of connections with the BGA or the Chicago Daily News would necessarily have rendered a venireman unfit to serve as a juror. If, under questioning, a prospective juror had disclosed that he had associations with the organizations, the court would then have had the duty to inquire of the venireman whether he could cast aside any biases or preconceptions he might have. Such an exchange might have revealed relevant and useful information either for challenging for cause or for exercising peremptory challenges.

The court did ask the prospective jurors whether there was any reason why they could not give the defendants a fair and impartial trial. Although such an inquiry might be considered broad enough to encompass many of the questions that the defendants wished to pose about particular prejudicial influences, as we have already said, in a case like the present one, a general question is inadequate to call to the attention of the veniremen those important matters that might lead them to recognize or to display their disqualifying attributes. *See* United States v. Robinson, 466 F.2d 780 (7th Cir. 1972).

Also, one of the questions submitted by the defense included inquiry as to whether the prospective jurors had ever heard of the case, had read about it or had ever discussed or expressed an opinion about it. This line of inquiry was not touched upon by the district court. We have laid particular emphasis in this opinion on the associational background of the two principal witnesses because the inquiry as to whether the jurors knew anything about the case was not

demonstrated to the court as being pertinent and material by a showing of extensive publicity in the news media.

On the other hand, we do note that one of the witnesses was a reporter for one of Chicago's principal newspapers, and it seems unlikely that the events of the day in question did not receive coverage. In any event, the question about prior knowledge and possible prior opinion would appear so basic as to have been the proper subject of inquiry upon request.

Therefore, while we are appreciative of the efforts of the experienced trial judge to "run a tight ship," we hold that reversible error was committed in failing to pursue to a reasonable extent significant lines of inquiry.[5]

Our determination makes it unnecessary for us to discuss the other alleged errors in the handling of the voir dire.

Because we are reversing the defendants' convictions, we shall treat only those other of the appellants' contentions which raise questions that might recur at a new trial.

■ Connon and Janow also protest that "[f]or reasons unstated in the record, the trial court cut off, in limine, all questions designed to show that . . . [their] reputation[s] . . . for honesty and for being law abiding citizens were good in the communities in which they resided." The Government acknowledges that an accused has the right to offer evidence of his good character (inferred from reputation testimo-

ny) to show that he was unlikely to have acted in the manner and with the intent charged in the indictment. It maintains, however, that defense counsel did not lay a proper foundation for such evidence.

■ Some of the witnesses answered questions as to the defendants' good reputations before objections were made thereto and ruled upon. Thus, the jury did, in fact, hear some reputation testimony; and the court did instruct the jury that it could consider the reputation testimony "to the extent that a question was asked and answered. . . ." However, substantial portions of proffered character testimony were excluded and because of the possibility of the problem arising in a new trial, we will consider this contention of the defendants. Although defense counsel may have laid a less than perfect foundation,[6] we are of the opinion that the district court's treatment of counsel's efforts was unduly restrictive, particularly in light of the few objections and rulings framed in clear, concrete and specific terms. *See* United States v. Battaglia, 394 F.2d 304, 326 (7th Cir. 1968), vacated and remanded on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (Circuit Judge Swygert dissenting).[7]

■ The Government primarily objects to the failure of counsel, in attempting to qualify the witnesses, to ask them if they resided in the defendants' communities.[8] The Government states

---

5. In his brief, co-defendant Lewin did not specifically challenge the adequacy of the voir dire; however, he certainly was adversely affected by the restrictions placed upon the questioning. We therefore will not let his conviction stand alone. Rule 52(b), Fed.R.Crim.P.

6. Although counsel complied more fully with the technical requirements of reputation testimony than the district court's rulings sustaining the Government's objections suggest, we agree that some of the questions and answers were improper, e. g., Father O'Donnell's testimony about specific acts of kindness that Connon had allegedly performed. Counsel

might have obviated some of the objections to his questions if he had asked them in a more logical, "building block" order. See Ladd, Techniques and Theory of Character Testimony, 24 Iowa L.Rev. 498, 518–27 (1939).

7. Although the majority opinion in *Battaglia* upheld the district court's exclusion of the character testimony, it was noted that "a more liberal approach to character witness rulings has precedential basis." 394 F.2d at 316.

8. The Government also criticizes defense counsel's asking the witnesses how long they had known the defendants. It is

that a prerequisite to a witness's testifying about the general reputation of a defendant in the defendant's community is that the witness reside in that same community.

Some courts in the past have assumed that such an identity of residence is essential. However, we think the better view is:

> "[I]t used to be ruled that·a reputation can be adequately learned only by the *witness' residence* in the place [of repute], not by a mere visit of inquiry, or by a casual sojourn, or by a conversation with a resident who reports the reputation. . . . But in modern days of organized investigation and research it is easy to see that this original common law rule is too strict. Systematic inquiry by a person coming from outside will often be a better source of knowledge than the casual opportunities of a neighbor or a friend. . . ." III Wigmore, Evidence § 692, at 20–21, 22 (Chadbourn rev. 1970) (emphasis in original).

■ Effective cross-examination minimizes the dangers that the Government sees in this modern approach. "A witness to reputation may *on cross-examination be tested,* like other witnesses, as to the sources of his knowledge. . . ." V Wigmore, Evidence § 1619, at 495 (3d ed. 1940) (emphasis in original). Such an examination, eliciting more detailed information than that developed by the party presenting the witness, might explore, for example, the witness's opportunities for acquiring information, the number of those whom he had heard make remarks about the person whose character is in issue, and how long the reports have prevailed. *See* Kroot v. United States, 66 F.2d 449, 451 (7th Cir. 1933).

Further, unlike Government counsel, we find no pronouncement of an identity-of-residence requirement in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the case upon which the Government relies for its contention. The following dictum of Mr. Justice Jackson in *Michelson,* at 478, 69 S.Ct. at 219, is compatible with the Wigmore view set out above: "[T]he witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." Indeed, under the Government's theory, the "typical examination" quoted in *Michelson, supra* at 471–472, 69 S.Ct. at 216, was inadequate; yet, the Court there did not comment adversely on the procedure used by Michelson's counsel.[9]

■ From the Government's quotation of a certain passage in *Michelson,* we gather that it also objects to questions concerning a defendant's general reputation as an honest, law-abiding citizen. Some judges have interpreted

---

true that the personal acquaintance of a "character witness" with a defendant is not a proper basis for the witness's opinion as to the nature of the defendant's reputation. However, "[g]eneral questions should be asked also to show that *W* personally knew *A,* and to show the· length of time and the place where he knew him. The purpose of these questions is to show that *W* has properly identified *A* as the individual to whom the statements made by others referred. and also to identify *A* as living in a particular place during a specified period of time." Ladd, Techniques and Theory of Character Testimony, 24 Iowa L.Rev. 498, 519 (1939).

9. We note particularly that Connon's counsel, in some of his questions and in his last offers of proof (to which the court sustained objections), strove to establish the crucial point that the witnesses had heard defendant Connon discussed by persons in his community and that their testimony about Connon's general reputation would be based on what they had heard from those people. *See* United States v. Battaglia, 394 F.2d 304, 316 (7th Cir. 1968), vacated and remanded on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Deschenes v. United States, 224 F.2d 688, 691–692 (10th Cir. 1955); and United States v. Pincourt, 159 F.2d 917, 920 (3d Cir. 1947).

honesty and law-abidingness to be specific character traits, inquiry about which is forbidden. However, neither this court nor the Supreme Court has condemned such an inquiry.[10]

While the court in *Battaglia, supra,* 394 F.2d at 316, adhered to "Mr. Justice Jackson's precept [in *Michelson*] not to 'disturb rulings of trial courts' in this troublesome field except in rare instances," the restrictions on the testimony in the case before us went beyond the limits tolerated in *Battaglia* and, when considered with the inadequate voir dire, supplement the necessity for reversal.

Defendant Janow claims that the evidence adduced at trial was insufficient to support the verdict against him. He maintains that his conviction can be sustained only if the jury's verdict was based on facts that exclude every other hypothesis than that of guilt. This standard allegedly cannot be met because the evidence against him was meager and inconclusive.

■ Where the prosecution's proof is circumstantial, courts, including this court, do sometimes refer to the standard Janow urges here. However, Janow mistakenly concludes that the "rule" that the facts must exclude every other hypothesis than that of guilt differs from the traditional standard applied in a criminal case. As we said in United States v. Wroblewski, 105 F.2d 444, 449 (7th Cir. 1939), "The rule is simply another form of the rule that the jury must be convinced beyond a reasonable doubt of the guilt of the defendant."

■ Further, as an appellate court, we must adhere to the principle that "[i]t is not for . . . [a reviewing court] to weigh the evidence or to determine the credibility of witnesses. The

verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L. Ed. 680 (1942).

■ Janow admits that he sat in the Legion Hotel lobby at a long table, which was the registration table, on October 7, 1968. He wrote on some of the yellow forms on that table. People who registered also wrote on these forms. He saw people receive money after they wrote on the papers. He was present during conversations between Connon and registrants and ˙Connon and Lewin, the topic of which was the payment of money for registration. Most importantly, he passed the dollar bill to defendant Connon, near whom he sat and who, throughout the day, had been giving money to registrants. Connon gave that bill to a man who had just written on the papers kept at the registration table. From all this, the jury was entitled to infer that Janow knew of the plan to pay people to register to vote and cooperated with others in the plan. *See* United States v. Fellabaum, 408 F. 2d 220, 224 (7th Cir. 1969), cert. denied, 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109. In addition, once the jury was satisfied that the Government had proved beyond a reasonable doubt Janow's knowledge and cooperation, it could ascribe to him the acts of his co-conspirators, Connon and Lewin, neither of whom challenge the sufficiency of the evidence used to convict them. Brown v. Elliott, 225 U.S. 392, 400–401, 32 S.Ct. 812, 56 L.Ed. 1136 (1912); United States v. Vittoria, 284 F.2d 451, 454 (7th Cir. 1960).

Defendants Connon and Janow also object to the admission of hearsay evi-

---

10. For example, in United States v. Battaglia, *supra,* defense counsel attempted to elicit an assessment of Evans's · general reputation as an honest, truthful, and law-abiding citizen. The majority opinion held counsel's efforts to be unsuccessful, not because the question was improper, but because no foundation had been laid to show that the witnesses knew

any of the people who lived in the community where Evans resided. In Michelson v. United States, 335 U.S. 469, 471, 69 S.Ct. 213, 216, 93 L.Ed. 168 (1948), one of defense counsel's standard questions was "Have you had occasion to discuss his reputation for honesty and truthfulness and for being a law-abiding citizen?"

dence in violation of exclusionary rules and contrary to this court's decision in United States v. Rohalla, 369 F.2d 220 (7th Cir. 1966). The two challenged items were: (a) testimony that the official records of the Chicago Board of Election Commissioners showed persons other than the defendants to be the duly certified registrars and (b) testimony that the Secretary of State's records showed the vehicle driven by Connon was registered in his name. A similar check was made on a car to which Janow was seen to go.

This testimony came from Recktenwald and Barlett and not from any official custodian of the records, although an official of the Board of Election Commissioners did testify as to other matters and brought subpoenaed records with him.

We would be inclined to think that the reasoning of Judge Cummings in *Rohalla, supra,* is particularly applicable here:

"Since defendant's counsel did not assure this Court that 'a good faith dispute exists' about the accuracy of this secondary evidence, its receipt 'must be classed as harmless error.'" *Rohalla, supra,* 369 F.2d at 226.

Further, in *Rohalla,* while no particular prejudice was shown, the vehicle registration records showed a Plymouth while testimony was that the defendant was driving an Edsel.

 Because we are reversing on other grounds, we do not decide whether *Rohalla* is still the law of the circuit, at least insofar as it may be applicable to the particular factual situation before us. We do observe, however, that unless and until *Rohalla* is overruled, caution would indicate that the better course for litigants would be to be prepared, if objection is properly made, to prove the contents of records by means other than hearsay testimony of a witness not connected with the custody of the records. We also observe that in the interest of economy of time of already overloaded courts, matters of no consequence and not subject to any dispute should not be put to the rigors of extended proof. Thus, here we can find no real significance in whether the defendants were or were not certified registrars. They were charged with conspiring to offer to pay and to pay persons for registering. Presumably this does not require a certified registrar.

Connon and Janow also contend that their sentences of two years plus fines of $2500 and costs were cruel and unusual, in violation of the Eighth Amendment to the United States Constitution.

Since the judgments are being reversed for a new trial for other reasons, we have no way of knowing whether there will be a conviction or, if there is, what the sentence will be. We do note, however, that both the sentences and fines are well below the statutory maximums of five years and $10,000.

Because of the importance of maintaining in a democratic society the entire voting process free of improper influences, we would not be prepared to find the punishment imposed to be a manifest abuse of discretion if this were the only error asserted.

We have examined the other errors alleged by the appellants, including the impropriety of receiving the verdict and entering the judgment in the absence of the defendants and their counsel, and have concluded that they are unlikely to arise on retrial or are without merit.

In accordance with the foregoing discussion, we reverse the judgments of conviction of defendants Connon, Janow and Lewin and remand for a new trial.

Reversed and remanded.