UNITED STATES of America,
Plaintiff-Appellee,

v.

Amelia GARCIA and Teresa Aleman Briones, Defendants-Appellants.

No. 83-2184
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 25, 1983.

Rehearings Denied Nov. 21, 1983.

Nelson R. Sharpe, Kingsville, Tex., for Garcia.

Baldemar Gutierrez, Alice, Tex., for Briones.

James R. Gough, Jack Lamar Wolfe, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before BROWN, TATE and HIGGINBOTHAM, Circuit Judges.

TATE, Circuit Judge:

The defendants Garcia and Briones were convicted after a jury trial on three counts of vote-buying and one count of conspiracy to buy votes in violation of 42 U.S.C. § 1973i(c).[1] In their appeal from these convictions, the defendants raise three contentions: (1) that the terms "pay", "payment" and "offer to pay", as used in the statute, are unconstitutionally vague if construed to include the offer and issuance of welfare food vouchers in exchange for a vote, (2) that the vote-buying provisions of the federal statute are unconstitutional as applied to their cases, and (3) that the evidence presented at trial was insufficient to support a finding of a "payment" or "offer to pay", since the persons who received the vouchers were allegedly eligible recipients.

Finding no merit to the defendants' contentions, we affirm their convictions.

Garcia, Briones, and two other co-defendants were indicted for conspiring and offering to pay voters to vote absentee for certain candidates in a Democratic primary election held on May 1, 1982 in Duval County, Texas. The primary election involved candidates for federal, state and local offices. At the time of the campaign for the primary election, the defendant Garcia was the Duval County Welfare Director and was responsible for issuing vouchers for food, clothing, prescriptions and medical services to indigent persons in need of welfare assistance.[2] The government charged that these four defendants offered welfare food vouchers to voters in return for their promises to vote absentee for certain local candidates in the Democratic primary election.

The government produced four witnesses who testified that the defendants, either individually or in groups of two or three, had offered them welfare food vouchers in return for their votes. Each of these witnesses stated that they understood that receipt of the food voucher depended upon their agreement to vote for the defendants' candidates, not upon their eligibility for welfare assistance. All of these witnesses were required to complete the standard application when they went to Garcia's office to claim their food voucher. Two witnesses testified, however, that the personnel in the welfare office had "everything . . . ready" and "knew what it was all about" when they arrived to claim their voucher. One witness stated that an office worker told

---

1. § 1973i(c) provides that:

    Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elec-

tions held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

2. The recipient could take these "vouchers" to a local merchant and redeem them for the specified dollar amount of the designated good or service.

her that Garcia had left a message with the office and that "everything is ready, but I have to ask you some questions."

Each of the defendants testified in their defense and denied offering anyone a food voucher or anything else in return for their vote. Garcia stated that the topic of food vouchers was raised during her campaign activities by several of the government's witnesses, but that she told these parties that they could go to her welfare office and apply for assistance and that, if they were found to be eligible, they would be entitled to a voucher. According to the defendants, any discussion of welfare food vouchers was entirely unrelated to their campaign work.

After hearing the evidence, the jury convicted Garcia, Briones and one of the co-defendants on all charges, but acquitted the other co-defendant on all counts. Garcia and Briones appeal their convictions to this court.

## I. "Vagueness" Challenge

The defendants contend that § 1973i(c) is unconstitutionally vague and indefinite if the terms "pay", "payment" and "offer to pay", as used in the statute, are construed to include the issuance of the redeemable food vouchers present in this case. They argue that "pay" and "payment" imply the exchange of cash, in the form of either coin or federal notes, and should not be read to include non-monetary welfare "vouchers" for goods or services.

■ While we agree that the definition of "payment" as used in § 1973i(c) does not necessarily extend beyond the transfer of money or a monetary equivalent when exchanged for a vote, we cannot find that a "payment" in the form of a welfare food voucher exceeds the ordinary meaning of the word or renders the intended scope of the statute unconstitutionally vague or indefinite. These food vouchers were issued in dollar amounts, and could be exchanged for the specified goods or services just as

could an equal amount of cash. The only significant difference between these vouchers and cash is that these vouchers were item-specific and could only be redeemed for the designated good or service.

The legislative history of the Act further supports our conclusion that the proscription against "payment" for votes was not limited to those in which cash is offered or given. § 1973i(c) was sponsored as an amendment to the Senate version of the Voting Rights Act of 1965 by Senator Williams of Delaware. As the remarks of the amendment's sponsor indicate, the scope of the term "payment" was not intended to be limited to "monetary payments." When introducing the amendment, Williams stated:

> Third, the amendment would provide a penalty for anyone offering or accepting money *or something of value* in exchange for registering or voting.

111 Cong.Rec. S8423 (daily ed., April 26, 1965) (emphasis added). Moreover, in a later debate on the amendment with Senator Javits, Williams explicitly stated that non-monetary payments would be covered by the amendment when used to purchase votes:

> I wish to make it as clear as it is possible to make it that it [the amendment] is intended solely to prohibit the practice of offering or accepting money *or a fifth of liquor—some payment of some kind—*for voting or registering.

111 Cong.Rec. S8986 (*daily ed., April 29,* 1965) (emphasis added).[3]

The explanation of the intent and meaning of § 1973i(c) by its legislative sponsor, adopted by the Senate after his explanation of its purpose and meaning, strongly supports a broader construction of "payment" for votes than one limiting the penalized vote-buying as restricted to instances when cash is exchanged or promised. This construction is in accord with the scope of the proscription of vote-buying in a related

**3.** The Senate approved the Williams' amendment by a vote of 86 to 0. On July 9, 1965, Representative Cramer introduced a virtually identical version of the amendment in the House of Representatives. 111 Cong.Rec. H16245–47 (daily ed., July 9, 1965). The House passed the measure without change. 111 Cong.Rec. H16281 (daily ed., July 9, 1965).

statute,[4] as well as with the indicated general purpose of the statute to penalize the giving or offer of items of pecuniary value directly to an individual voter to obtain his vote.

█ We therefore find that Congress did not intend to restrict the term "payment" in § 1973i(c) to offers of money, and that the term was intended to include items of pecuniary value offered or given directly to an individual voter in exchange for his individual vote, such as the welfare food vouchers present here. While a food voucher may not be valuable to the person who issues it, it has the same significance as cash to the person receiving it. And since the intent of Congress was to prohibit the direct offer or giving to an individual voter of an item of pecuniary value in order to obtain his or her vote, an assessment of the monetary worth of an item from the perspective of the voter receiving the item, and not the person offering it, accords with the legislative intent of the statute.

In summary, as applied to the present defendants, we do not find that § 1973i(c) is unconstitutionally vague insofar as the proscribed "payment" for votes is construed, in accord with the legislative intent, to include the offer or facilitated-issuance of redeemable cash-equivalent welfare food vouchers directly to the individual voter in exchange for his or her vote.

## II. Tenth Amendment Challenge

█ The defendants next contend that the vote-buying provisions of § 1973i(c) are unconstitutional as applied in the present case. Garcia and Briones argue that the federal statute on its face applies only to illegal activities affecting a federal election.[5] In this case, both the indictment and the evidence presented at trial relate only to the defendants' activities in soliciting votes for a candidate for county judge, even though the evidence proved that candidates for the United States Senate and House of Representatives were also on the same ballot. Because it was neither proved nor alleged, however, that the defendants engaged in any conduct to influence an election for federal office, Garcia and Briones claim that the statute cannot be extended to encompass their entirely local activities without violating the Tenth Amendment principles that may reserve for the states any powers not expressly granted to the federal government. See *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The constitutionality of § 1973i(c) has twice before been challenged in this circuit on the ground asserted here. In both instances, we found that the statute did not exceed the limitations imposed by the Tenth Amendment. *United States v. Malmay*, 671 F.2d 869, 875 (5th Cir.1982); *United States v. Bowman*, 636 F.2d 1003, 1011 (5th Cir. 1981). When candidates for federal office appear on the same election-day ballot with the local candidates who have been the target of illegal vote-buying activities, the Necessary and Proper Clause affords Congress ample power to regulate conduct in the pendant state election to exclude the possibility of tainting, distorting or otherwise unfairly affecting the results of a federal election. *Bowman, supra,* 636 F.2d at 1011. *See Malmay, supra,* 671 F.2d at 874–75. *Accord, United States v. Carmichael,* 685 F.2d 903, 908 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983). Accordingly, § 1973i(c) as applied to these defendants does not exceed Tenth Amendment limitations.

4. Similarly, 18 U.S.C. § 597 provides that any person who "makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate ... shall be fined ... or imprisoned." An earlier provision in that statute defines "expenditure" as a "purchase, payment, distribution, loan, advance, deposit, or gift of money *or anything of value* ...". 18

U.S.C. § 591(f) (emphasis added). This language indicates that, in the context of statutes restricting vote-buying activities, Congress did not intend to distinguish between the use of money and monetary equivalents in unlawful payments made to influence voters.

5. *See* note 1, *supra.*

### III. *Sufficiency of Evidence*

The defendants finally claim that the evidence presented at trial was legally insufficient to support a finding of a "payment", even if that term is construed to include welfare food vouchers. Since the government presented no evidence to show that the persons who received the food vouchers were not eligible for that relief, the defendants argue that the issuance of the food vouchers cannot be considered an illegal payment.

The government witnesses testified that they were offered food vouchers in return for their votes. Although hindsight may reveal that these individuals turned out to be eligible for the vouchers, the jury could find from their testimony that the offer to give them vouchers in exchange for their votes was not conditioned upon the recipient meeting the eligibility guidelines. Moreover, at least two of the government's witnesses testified that, when they went to Garcia's office subsequent to their agreement to vote for the defendants' candidates, the personnel at the welfare office had been notified and had anticipated their arrival to claim their vouchers.

The defendants forthrightly testified that no such offer was made, and that any discussions of food vouchers during the campaign were unrelated to voting activities and were strictly predicated on the person making a proper application and meeting the guidelines for eligibility. Essentially, their defense was that they were merely assisting the voters in obtaining benefits to which they were entitled, and thus did not violate the vote-buying statute. *See United States v. Lewin*, 467 F.2d 1132, 1137 (7th Cir.1972) (civic-minded activities not proscribed by § 1973i(c)). The record reveals,

however, that this defense was submitted to and rejected by the jury.

In its instructions, the district court submitted to the jury the defense that the government's voter-witnesses were merely eligible recipients who happened to come into contact with the defendants while they were campaigning:

[The defendants] denied throughout this trial that they ever offered anyone anything to vote. And where any payments were made, they have told you that those payments were made, not for purposes of getting someone to vote or to induce them to vote, but rather that did not happen, and what actually happened was that in good faith they simply directed those that were involved in the payments—you heard about that—were so involved because these people were entitled to the money and that voting had nothing to do with it and did not enter into the discussions whatsoever.

They very clearly told everybody—to one particular lady they said, "Look, you can go down to the welfare office and make an application, and if you are eligible for payments, you will be paid," and that they said they were not paying anybody to go vote. If that's the way it happened in that particular instance, then there would not be any violation of law.[6]

Given this choice, the jury rejected the defendants' explanation of the events and accepted the testimony of the government witnesses by convicting all but one of the defendants.

█ In a challenge to the sufficiency of the evidence supporting the verdict of a jury, we must give deference to the findings of the jury. We must "view the evi-

---

**6.** In fact, in response to the request of one of the defense attorneys, the judge later reemphasized that point to the jury.

[T]here was testimony in this case, specifically by Miss Garcia, who was with the welfare office, that she did suggest, in response to an inquiry, to one of these voters that they had a right to go to the welfare office and apply for payment and that, if they were eligible and they qualified, that they would get whatever they might be entitled to. That

was the substance of her testimony as I recall it. And certainly if she did this and it was a good faith explanation on her part, then she wouldn't be guilty of anything, because as I told you before, the crux of this offense, these various violations that were charged, is the tainting of our election process, and it is only when a person offers to pay or pays someone to go vote that you would have a crime within these statutes.

dence presented in the case and the inferences that may be drawn from it in a light most favorable to government and ask whether 'a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" *United States v. Jackson,* 700 F.2d 181, 185 (5th Cir.1983), *quoting in part United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc). Applying this standard to the present case, we are unable to find that a reasonable jury could not have found beyond a reasonable doubt that the defendants offered welfare vouchers to voters for the purpose of buying their votes.

IV. *Conclusion*

Finding the defendants' claims to be without merit, we AFFIRM their convictions.

AFFIRMED.